*In re* CHARLES WILLIS, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* CHARLES WILLIS, Respondent-Appellant.)

First District (2nd Division)   No. 79-268

Opinion filed October 7, 1980.

James J. Doherty, Public Defender, of Chicago (Robert D. Glick and Frances Sowa, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Ellen M. Pflaum, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE PERLIN delivered the opinion of the court:

Charles Willis, a minor (hereinafter referred to as respondent), was charged by a delinquency petition with one count of murder during the

commission of a forcible felony in violation of section 9—1(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(3)); one count of murder in violation of section 9—1(a)(1) of the Code (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(1)); and one count of burglary in violation of section 19—1(a) of the Code (Ill. Rev. Stat. 1975, ch. 38, par. 19—1(a)). Respondent filed a motion to suppress any and all statements made by him relating to these charges. This motion was denied after a lengthy hearing. Following an adjudicatory hearing, the trial court found the evidence sufficient to prove respondent guilty beyond a reasonable doubt on all counts and adjudicated respondent a ward of the court. After a dispositional hearing, respondent was committed to the Juvenile Division of the Department of Corrections. Respondent appeals presenting the following issues for review: (1) whether respondent's statements should have been suppressed because they were the product of an alleged unlawful arrest; (2) whether statements by respondent were made voluntarily after a knowing and intelligent waiver of his constitutional rights; and (3) whether respondent's delinquency was established beyond a reasonable doubt.

For reasons hereinafter set forth, we affirm the judgment of the circuit court of Cook County.

On October 27, 1977, James Weathersby (hereinafter referred to as the decedent) was shot to death when he returned to the apartment in which he resided with the Albert Jackson family at 114 South Spaulding and interrupted a burglary in progress. The apartment had been ransacked and a weapon belonging to Mr. Jackson had been taken from the apartment. The body of decedent was found in the living room.

Because a detailed discussion and analysis of the facts is required by the nature of each issue presented for review and because the record is voluminous, clarity and brevity suggest that the facts pertinent to each issue be set forth in the discussion of that issue.

## I.

Respondent contends that his arrest was unlawful because the police did not obtain an arrest warrant prior to arresting him at his home, and that as a result thereof his subsequent statements should have been suppressed as the product of the unlawful arrest. The State maintains that respondent's arrest was lawfully executed, even though an arrest warrant had not been obtained, and that as a consequence thereof, respondent's statements were properly admitted into evidence. Respondent does not argue that the police did not have probable cause to arrest him. The question presented for review, therefore, is whether the fact that the police had no arrest warrant vitiated the arrest and tainted respondent's subsequent statements.

On November 10, 1977, Investigator Dwyer of the Chicago Police Department was investigating the October 27, 1977, burglary and homicide. Bobbie Driskel, one of the three juveniles who had been taken into custody for questioning regarding the October 27, 1977, burglary and homicide, implicated respondent during an interview which began at approximately 4:30 p.m. Dwyer, accompanied by Investigator Wasmund, youth officer O'Neil and policewoman Ramos, proceeded to the home of respondent at approximately 5:30 p.m. with the intent "to bring him into Area 4 for questioning." The officers were informed by respondent's mother that respondent was not at home. Wasmund and O'Neil advised her that they wished to speak to respondent concerning a burglary. O'Neil gave respondent's parents his name and telephone number and asked respondent's parents to call him when respondent returned home. At approximately 7:30 p.m. O'Neil received a call from respondent's mother informing him that respondent had returned home. Dwyer and Wasmund proceeded to respondent's home and were met at the door by respondent. The officers identified themselves and asked respondent to accompany them to headquarters for questioning with regard to a burglary which had occurred at 114 South Spaulding. Dwyer advised respondent's mother that they were taking respondent to Area 4 headquarters for questioning concerning the burglary and that she could accompany them. Although respondent's mother indicated an intention to accompany the respondent, she did not so do.

In ruling upon respondent's motion to suppress, the trial court found that the respondent "was, in fact arrested at [the time he was taken into custody by police officers]"; that "the police officers indeed had probable cause to arrest the minor respondent at that time and place"; and that "the arrest was not in violation of the minor respondent's constitutional rights or any other rights delineated by statute or any other law."

Whether a warrantless and nonconsensual entry into the home of a suspect by police officers for the purpose of making an arrest supported by probable cause must also be supported by proof of exigent circumstances, until recently, was an issue unresolved by the United States Supreme Court, Federal courts of appeals, many State courts and the courts of this State. We have held this case under advisement pending our supreme court's decision in *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543. *Abney* enunciated the rule that "exigent circumstances must be present to justify a warrantless entry to arrest." (*Abney*, at 168.) The arrest in the instant case was without a warrant, and thus we are concerned with whether exigent circumstances existed which militated against delay and justified the officers' decision to proceed without a warrant.

■■ It is our opinion that such exigent circumstances were present in the

case at bar and that the officers acted in a reasonable fashion. First, the officers' decision to proceed to defendant's residence without a warrant followed immediately receipt of Driskel's statement implicating respondent. The receipt of such information about a relatively recent offense could suggest to the officers a need for prompt action. (See, *e.g.*, *People v. Sakalas* (1980), 85 Ill. App. 3d 59, 405 N.E.2d 1121.) Second, and closely related to the fact that the officers acted promptly, there was no deliberate or unjustified delay by the officers during which time a warrant could have been obtained. Unlike the invalid warrantless search in *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 478, 29 L. Ed. 2d 564, 91 S. Ct. 2022, for example, the officers in the instant case did not contemplate their course of conduct for an extended period of time: respondent was arrested within three hours of Bobbie Driskel's statements implicating him. (*People v. Haynes* (1980), 89 Ill. App. 3d 231, 411 N.E.2d 876.) Finally, the need for prompt action was further made apparent by the belief that respondent was possibly armed and exhibited some sign of a violent character. The offense charged, murder, is unquestionably a violent offense. Moreover, a gun which had been taken from the burglarized apartment and which may have been used to shoot the victim,[1] had not been accounted for.

In addition to the exigent circumstances set forth above, other factors were present which suggest that the officers acted reasonably. First, the officers were acting on a clear showing of probable cause based upon the type of reasonably trustworthy information necessary to justify warrantless law enforcement activities. Bobbie Driskel, a friend of respondent who had been taken into custody by police for questioning regarding the burglary and homicide, informed police of respondent's participation. Second, the police officers had strong reason to believe that respondent was in the premises entered. Respondent's mother had called Officer O'Neil to inform him that respondent had returned home. Finally, the entry here was peaceful and not the type of forced entry that has led courts to disapprove warrantless entries.

In summary, we see no cause to hold invalid the entry here and the resultant statements made by respondent.

## II.

Respondent also contends that his statements should have been suppressed because they "were not a product of a knowing and intelligent waiver of his constitutional rights, but rather were the result of fear, lack of intellectual capacity and the circumstances of his interrogation." The State responds that the evidence adduced at the hearing on the motion to

---

[1] Testimony adduced at trial was not conclusive as to whether the weapon stolen was the weapon causing victim's death.

suppress was sufficient to support the trial court's finding of a knowing and intelligent waiver. The State further maintains that respondent possessed sufficient intellectual capacity to knowingly and intelligently waive his constitutional rights, and that the statements were made voluntarily, not as a result of police misconduct or intimidation. While the trial court is required to take special care in scrutinizing the record to determine whether a minor's confession was voluntary *(People v. Simmons* (1975), 60 Ill. 2d 173, 181, 326 N.E.2d 383), the finding of the trial court as to whether a statement is involuntary will be sustained unless contrary to the manifest weight of the evidence. *(People v. Higgins* (1972), 50 Ill. 2d 221, 225, 278 N.E.2d 68; *People v. Baker* (1973), 9 Ill. App. 3d 654, 661, 292 N.E.2d 760.) Whether a statement was involuntarily given must be determined not from any one factor but from the totality of the circumstances. *(People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601.) Consideration must be given to " 'both the characteristics of the accused and the details of the interrogation.' " *(Simmons* at 179, citing *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 226, 36 L. Ed. 2d 854, 93 S. Ct. 2041.) The test is whether the statement has been made freely, voluntarily and without compulsion or inducement of any sort or whether respondent's will was overcome at the time he confessed. *(People v. Prude* (1977), 66 Ill. 2d 470, 475, 363 N.E.2d 371, citing *Prim*, at 62.) While the mental capacity of respondent must be taken into consideration in determining whether his actions are voluntary, mental deficiency of itself does not render a confession involuntary *(People v. Hester* (1968), 39 Ill. 2d 489, 500, 237 N.E.2d 466); it is a factor which must be considered in the totality of the circumstances. *People v. Turner* (1973), 56 Ill. 2d 201, 206, 306 N.E.2d 27.

We first consider the characteristics of respondent as reflected by the record. At all times relevant to the discussion herein respondent was 14 years of age. Sandra Maria Reed, a reading teacher at Cregier Vocational High School, testified that respondent was one of her students; that his grades were below average; that he had a short attention span; that he did not easily understand oral instructions; that he had an I.Q. of 76; and that he read at a "high third grade level." Miss Reed opined that respondent was capable of understanding the questions regarding the incident which were contained in his statement and that his answers thereto were appropriate.

Dr. Susanna Pflaum, an associate professor at the University of Illinois Circle Campus, testified that she had administered to respondent the Peabody Picture Vocabulary Test. The results indicated respondent had an I.Q. of 76 and a mental age of 10 years, two months. Dr. Pflaum opined that respondent could understand the questions posed to him

regarding the incident, if read to him. She found respondent's answers to these questions appropriate and mature. Dr. Pflaum further testified that a colleague's analysis of the *"Miranda* warnings card" concluded that a reading ability of a fifth or six grade level was required to comprehend the admonitions. She testified that a reading analysis of questions posed to respondent concerning his constitutional rights required a reading comprehension ability at a seventh or eighth grade level. However, on cross-examination she indicated that a fifth or sixth grade level was adequate to comprehend these questions. Dr. Pflaum suggested that respondent would be unable to read the questions and, further, would be unable to understand the warnings even if read to him. She acknowledged that an individual's personal experiences with the police and with the *Miranda* warnings affect that individual's ability to understand the warnings.

Hasker Mitchum, a special education counselor at Cregier Vocational High School, testified that the results of the Iowa Basic Skills Test which had been administered to respondent in May 1977, when respondent was in eighth grade, indicated that respondent's vocabulary grade level was seven years, seven months, or one year, three months behind his grade level. Respondent's reading comprehension was five years, four months.

Officer Richard Meister testified that on November 8, 1977 (two days prior to the questioning of respondent in the case at bar), he had responded to a radio call concerning a burglary unrelated to the case at bar. Upon Meister's arrival at the scene, he apprehended respondent and advised him of his constitutional rights. Respondent indicated that he understood them. Officer Daniel Benoit testified that he "processed" respondent for the November 8, 1977, burglary. Prior to questioning, Benoit advised respondent of his constitutional rights but felt that respondent did not quite understand. Benoit then "brought [himself] down to [respondent's] level and explained to [respondent] what he meant." Respondent replied that he understood that "he didn't have to say anything at all if he didn't want to"; that "anything he said would be written down" and "given to the Judge"; and that he could have an attorney "before we did any talking to him at all." When Benoit repeated to respondent that anything he said would be "typed and given to the Court," respondent refused to make a statement. Neither respondent's mother nor the victim of the November 8, 1977, burglary heard respondent being advised of his rights. In addition to the November 8, 1977, burglary and the case at bar, respondent has three previous police station adjustments.

Respondent's mother testified that during respondent's summer 1977 reading courses he had been required to read the United States Constitution. She further testified "we drilled him and he learned it."

We next consider the details of the interrogation as adduced at both the suppression hearing and at the adjudicatory hearing.[2] Respondent, in the company of Officers Dwyer and Wasmund, arrived at police headquarters at approximately 8:30 p.m. and was placed in an interview room. The officers' first interview with respondent continued until approximately 9 p.m. Present at that interview were Officers Dwyer, O'Neil and Shull. Respondent was advised of his *Miranda* rights by Dwyer and was advised that he was under arrest for the homicide of James Weathersby. Officer O'Neil's testimony confirmed that respondent had been advised of his constitutional rights; that respondent had not requested an attorney; and that respondent had not indicated that he wished to terminate the interview. O'Neil also noted that respondent had not requested food or drink. Officer Shull's testimony confirmed that respondent had been advised that he was under arrest for murder. Respondent was then left alone in the interview room.

A second interview with respondent occurred at 10:30 p.m. and continued for approximately 30 to 45 minutes. Present at that interview were Officers O'Neil, Shull and Dwyer and assistant State's Attorney Joel Goldstein. Goldstein testified that he advised respondent of his constitutional rights. Goldstein further testified that respondent had seemed alert, comfortable; and that respondent had not complained, requested an attorney nor indicated that he wished to terminate the interview. O'Neil's testimony confirmed that the respondent was advised of his constitutional rights; that he had not requested an attorney or that the interview be terminated; and that he had not requested either food or drink. Although Officer Dwyer could not recall whether respondent had been advised of his rights, Dwyer did recall that respondent expressed no wish to terminate the interview or to have an attorney present; and that no threats or promises had been made by any of the interviewers. Respondent's mother was present during part of this interview. She recalled that an officer had told respondent that "he was trying to be a tough guy and he would get nowhere by being tough." Another officer told respondent "that they had fingerprints, and knew he was there." Respondent replied, "I was there, but I didn't do it." He then began to answer questions concerning the burglary and homicide. Goldstein's testimony at the adjudicatory hearing reveals that respondent answered that he and Driskel had entered the apartment through the kitchen window. Driskel went into the bathroom while respondent went into the bedroom. Respondent emptied the contents from the dresser drawers while searching for money. Approximately 10 minutes later he heard someone enter the front door of the apartment and he ran to the kitchen window while

---

[2] Respondent did not testify at the suppression hearing. However, his testimony at the adjudicatory hearing primarily concerned the details of his interrogation.

Driskel attempted to hide behind the bathroom door. When the man who had entered the apartment called out, "Who's there?" and started walking toward the bathroom, Driskel shot twice with a silver-colored gun, about eight inches long. The man staggered a few steps and then fell. Respondent went out the kitchen window and waited for approximately two minutes until Driskel emerged. They both ran to a friend's house. At the conclusion of this statement, respondent was left in the interview room.

At approximately 11:45 p.m. assistant State's Attorney Goldstein observed respondent's parents with respondent in the interview room, and he joined them for a few minutes. He discussed with them the evidence indicating respondent's involvement in the burglary and homicide. He heard respondent's parents advise respondent to cooperate with the police. Policewoman Annitta Mary Ramos testified that she spoke with respondent at approximately 1 a.m. in the presence of his mother to obtain general information for the arrest report.

A third interview with respondent occurred at approximately 1:30 a.m. on November 11, 1977, which continued for approximately 20 minutes. Officer Dwyer, assistant State's Attorney Goldstein and respondent's parents were present. Although respondent's mother testified that respondent had been advised of his constitutional rights, neither Dwyer nor Goldstein could recall having so advised respondent. Respondent's mother testified that respondent gave a statement. Goldstein remarked that the burglary and homicide had not happened in the manner described by respondent and asked respondent if he "wanted to change his story." Goldstein's testimony at the adjudicatory hearing reveals that respondent related substantially the same account of the incident as he had at the second interview but admitted for the first time that Fred Clark had been with him and Driskel. Clark had accompanied respondent into the bedroom, and both had run into the kitchen when they had heard victim enter the apartment. Respondent had not mentioned Clark earlier because Clark had threatened to kill both him and Driskel if they implicated him.

A fourth interview occurring at approximately 4 a.m. continued for approximately 30 minutes. Present were Officers O'Neil and Shull, assistant State's Attorney Goldstein, court reporter Joseph Szybist and respondent's mother. Goldstein testified that prior to taking respondent's statement, he had advised respondent of his rights and had ascertained that respondent understood them. Goldstein also ascertained that no threats or promises had been made to respondent; that respondent had not been mistreated; that he had been offered something to eat and drink; and that he had been permitted to use the lavatory. O'Neil's testimony confirmed that respondent had been advised of his rights, that he had not requested an attorney or requested that the interview be terminated. Both

O'Neil's and Shull's testimony confirmed that respondent had not requested food or drink. Szybist's testimony confirmed that respondent had been advised of his rights; that respondent had replied that he understood his rights; that respondent had replied "yes" when asked if he wished to tell the officers what happened. Szybist testified that he had recorded and transcribed respondent's statement. Respondent was given the transcript to read and sign, which he did. A review of the transcript of respondent's statement indicates it is substantially the same as the oral statement given by respondent at the third interview.

Respondent's mother testified that respondent had never complained of mistreatment. She had at no time advised the officers, the assistant State's Attorney or anyone else that she did not wish respondent to make a statement. Both she and her husband had cooperated with the police.

Respondent testified at the adjudicatory hearing that on November 10, 1977, at approximately 7:15 p.m., as he was about to eat his supper, two police officers came to the door and informed him that they wished to speak to him concerning a burglary. He was taken to the police station, placed in a small room and questioned by three officers. Respondent did not understand all the questions but answered those that he did. When the officers left him, he tried to sleep, but they returned, woke him and told him to stand up. The officers opened the door to both his interview room and the room across the hall where Bobbie Driskel had been placed. Driskel identified respondent. The officers again left respondent alone in the room. When the officers returned, they told him that he and Driskel had burglarized the house at 114 South Spaulding and then asked him to "admit it." He refused because "it was not true." He was told by police that after they were finished questioning him, they could call his mother to take him home.

Respondent testified that police again asked if he was with Driskel, and he again denied it. He was afraid at this time because he thought the police would not permit him to go home. The police told him he could go home if he admitted "it," and they once more left him alone.

When the police returned, they took respondent into another room, similar to the first, for questioning. Two officers left, and a female officer remained. She asked him his name, his address and his school. Another officer in the room advised him that being stubborn was not going to help him. Respondent's parents arrived, and he was alone with them for awhile. Some police officers returned and once again asked him if he was a participant in the burglary and homicide. The officers told him that he entered the apartment through the kitchen window, that he then went into the bathroom. Although he first denied participation, he later admitted participation because he thought that his mother had come to take him home and that the police would permit him to go home.

Respondent testified that he remembered answering questions and admitting his presence at 114 South Spaulding while the court reporter was present but did so only because he thought his mother was going to take him home. Respondent further testified that the statements he gave were not true. He did not read his statement when it was given to him and signed it only because he was told to do so.

Upon cross-examination, respondent acknowledged that he had answered the questions posed to him in his own words and had not just answered affirmatively or negatively. He also acknowledged that his mother was with him at least one-half of the time he was at the police station.

The record reveals that the trial court heard the testimony of 16 witnesses, including respondent's mother, at the hearing on the motion to suppress. Prior to ruling on the motion the trial court summarized the testimony, made detailed findings of fact and cited extensive case law. It is evident that the trial court did employ the required "special care in scrutinizing the record" (*Simmons*, at 181) to determine whether respondent's statements were voluntary. In ruling that respondent's statements were voluntary, the trial judge articulated the following grounds, in substance: (1) that at no time did respondent or his parents request to speak to an attorney or have one present; (2) that neither respondent nor his parents complained to anyone of mistreatment of any kind; (3) that respondent was never physically or mentally abused by police or anyone else; (4) that no threats or promises were made to respondent, nor was he coerced, tricked or deceived; (5) that respondent was at all times treated kindly, considerately and humanely; (6) that respondent was properly and fully advised of his constitutional rights and that he fully understood those rights, and that he knowingly and intentionally waived each of those rights; (7) that respondent's youthful age and mental capacity did not prevent him from understanding his rights, nor from knowingly and intelligently waiving those rights; and (8) that the record indicates a total absence of any of those obnoxious factors which would render a statement of confession involuntary.

Respondent directs our attention to *People v. Devine* (1974), 17 Ill. App. 3d 1053, 309 N.E.2d 76; and *People v. Baker* (1973), 9 Ill. App. 3d 654, 292 N.E.2d 760. In *Devine*, the appellate court at page 1057 noted that "[i]t is apparent to us that the defenant's subnormal intelligence was an important but not decisive factor leading the trial judge to suppress his confession and statement." The trial court and the appellate court both noted the following additional factors, none of which are present in the case at bar: that two months subsequent to the taking of the statements, defendant requested a competency hearing wherein a jury determined that defendant did not understand the nature of the charges and would be

unable to cooperate with counsel; that defendant attempted suicide while in police custody; and that defendant was interrogated "somewhat continuously" from 7:30 p.m. to about 4 a.m. without the presence of family members or an attorney.

In *Baker*, defendant was 15 years of age, had an I.Q. of 72, with a mental age of approximately four years less than his actual age. Unlike the instant case, Baker was in police custody without seeing his parents from 10 p.m. on September 9, 1971, until after 9 a.m. on September 11, 1971, although he had asked to see his parents 10 or 12 times.

The crucial test to be used in determining whether an accused knowingly and intelligently waived his rights is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear understandable warning of all of his rights. (*Baker*, at 660.) Courts of review are committed to the principle that the trial court, who had the opportunity to see and hear the witnesses, is the one most qualified to judge their credibility. *Baker*, at 660-61.

■■ In the case at bar the trial judge, giving the above evidence due weight, was justified in finding that respondent was possessed of sufficient intelligence to understand and knowingly waive his rights, and that his statements were made freely and voluntarily. See *People v. Carpenter* (1976), 38 Ill. App. 3d 435, 347 N.E.2d 781, *appeal denied* (1976), 63 Ill. 2d 559.

■■ Respondent also appears to argue that the statment by police that "they had fingerprints" was a misrepresentation in that no fingerprints connecting respondent to the crime were placed in evidence. Testimony at trial indicates that prints were collected but were apparently unidentifiable, although this latter fact may not have been known to the officer at the time the alleged statement was made. Even if the alleged statement may be construed as a misrepresentation of evidence leading respondent to believe his fingerprints had been recovered, it was not a deception "likely to produce an untrustworthy confession nor so reprehensible as to be offensive to basic notions of fairness." *People v. Boerckel* (1979), 68 Ill. App. 3d 103, 111, 385 N.E.2d 815.

Thus we conclude that the finding of the trial court that respondent's statements were voluntary is not against the manifest weight of the evidence.

### III.

Finally respondent contends that the evidence adduced at the adjudicatory hearing was insufficient to establish his delinquency beyond a reasonable doubt. In support of this contention, respondent argues that the State's evidence indicating that the body of the decedent was found in

the living room contradicts rather than corroborates his statement that the victim was shot in the hallway. The State responds that this discrepancy between respondent's statement and the evidence was for the trial court as the trier of fact to assess; and that the trial court may have disbelieved respondent's version of the shooting, yet chose to believe the remainder of his statement. The State further maintains that the discrepancy between the evidence presented by the State and respondent's version was an attempt by respondent to minimize his culpability for the actual shooting and did not raise a reasonable doubt as to his delinquency.

■■ While a conviction cannot be based upon a confession alone, the other evidence in the case need not be sufficient by itself to connect the defendant to the offense. (*People v. Jones* (1962), 26 Ill. 2d 381, 385-87, 186 N.E.2d 246; *People v. Lueder* (1954), 3 Ill. 2d 487, 488-89, 121 N.E.2d 743.) It is enough if the other evidence either tends to show that a crime did in fact occur (see, *e.g.*, *People v. Bishop* (1934), 359 Ill. 112, 194 N.E. 238) or to corroborate the confession (see, *e.g.*, *People v. O'Neil* (1960), 18 Ill. 2d 461, 165 N.E.2d 319). (*People v. Norcutt* (1970), 44 Ill. 2d 256, 263, 255 N.E.2d 442.) A confession is not conclusive of every statement therein, and must be weighed in the same manner as other evidence. (*People v. Uselding* (1967), 85 Ill. App. 2d 323, 325, 230 N.E.2d 1.) Thus, an accused's confession need not be accepted or rejected in its entirety, and the trier of fact may consider any discrepancies between the confession and the evidence adduced at trial in assessing the degree of credibility to afford the confession. *People v. Hester* (1968), 39 Ill. 2d 489, 511-12, 237 N.E.2d 466; *People v. Carter* (1978), 57 Ill. App. 3d 84, 87, 372 N.E.2d 1093.

Albert Jackson, who with his family and the decedent resided at 114 South Spaulding, testified that he kept a .357 magnum Colt Python revolver and a box of ammunition on the top shelf of the bedroom closet. These items were on the shelf when he left home on the morning of October 27, 1977, but were missing when he examined the closet following the burglary and homicide. He described the missing weapon as "nickel-plated, silvery looking" and approximately eight or nine inches in length. Several other items from the closet shelf were strewn on the floor, and a chair which had been in the kitchen was in the closet. The dresser drawers had been removed and their contents had been emptied onto the bed and the floor. The desk in the dining room had been ransacked, and beer and Pepsi Cola bottles from the refrigerator had been found in the dining room. Jackson observed that the bathroom toilet had been used. Jackson also observed that the kitchen table had been moved out from the wall, that a chair was missing, and that the kitchen window was open with "the steel mesh wire on the outside of the window

pulled up." Jackson also testified that there was a staircase at the rear of the house underneath the kitchen window.

Donald Smith, a firearms examiner for the Chicago Police Department, testified that in his opinion the spent bullet found on the couch at the decedent's apartment could have been fired from a Colt .357 magnum or .38 special or a Marucue .38 special.

In his written statement respondent admitted that after he, Driskel and Clark had entered the apartment through the kitchen window, he and Clark had gone into the bedroom while Driskel had gone into the bathroom. Respondent also described the weapon which he alleges Driskel used to shoot the decedent as "a silver gun" about eight inches long.

■■ We conclude that respondent's confession and the evidence offered by the State were sufficient to establish respondent's delinquency beyond a reasonable doubt.

Based upon the foregoing we affirm the judgment of the circuit court of Cook County.

Affirmed.

DOWNING and HARTMAN, JJ., concur.