*In re* W.C., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. W.C., Respondent-Appellant).

First District (2nd Division)   No. 1—93—0182

Opinion filed April 19, 1994.

Nathan P. Eimer, Joshua J. Mintz, Joseph D. Kearney, Robert R. Kimball, and Kathleen M. Mulligan, all of Sidley & Austin, of Chicago (Karen M. Berman and Maria Woltjen, both of Chicago Lawyers' Committee for Civil Rights Under Law, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Peter Fischer, and Elizabeth A. Scholz, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:
Following a hearing pursuant to the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1991, ch. 37, par. 801—1 *et seq.* (now codified as 705 ILCS 405/5—13 (West 1992))), respondent W.C., a 14-year-old minor, was adjudicated a delinquent for his involvement in the killing of Carey "Skip" Long and committed to the custody of the Department of Corrections. On appeal, respondent contends that (1) the circuit court erroneously denied his motion to suppress; (2) he was not proved accountable for murder beyond a reasonable doubt; (3) the circuit court improperly found him delinquent for two counts of first degree murder where only one person was killed; and (4) the circuit court abused its discretion in committing him to the custody of the Department of Corrections.

On June 1, 1992, a petition was filed pursuant to the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1991, ch. 37, par. 805—13 (now codified as 705 ILCS 405/5—13 (West 1992))), alleging that respondent was delinquent because on May 28, 1992, he shot and killed Carey Long in the face and back, knowing that such act would cause death (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(1) (now codified as 720 ILCS 5/9—1(a)(1) (West 1992))) and that such act created a strong probability of death (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(2) (now codified as 720 ILCS 5/9—1(a)(2) (West 1992))). The pretrial social investigation report determined that respondent had three prior referrals to juvenile court: for aggravated battery, possession of a stolen motor vehicle, and disorderly conduct. Each of those charges was stricken with leave to reinstate. The report also disclosed that he had three station adjustments: for driving without consent when he was 10 years old, shoplifting, and racial mob action. The pretrial psychological evaluation determined that respondent's IQ was 47, but the psychologist believed that the score was artificially low as a result of the trauma of being detained. The psychologist did conclude, however, that respondent had the emotional maturity of a six- or

seven-year-old child. The State sought to prosecute respondent as an adult, but the circuit court denied the motion.

At the adjudicatory hearing, the following evidence was presented. Emma Coleman testified that her son Carey Long was 29 years old when he died on May 28, 1992. She also stated that he was known as "Skip."

Officer Steven Gale of the Chicago police department testified that on May 28, 1992, at approximately 8 p.m., he received a radio report that a man had been shot at 5447 South Indiana in Chicago. When he arrived at the scene, he observed Long "sprawled in the back lot." Long appeared to be in serious need of medical attention because his face and one of his arms were covered with blood. He also noticed that Long's pants pockets were turned inside out.

Assistant State's Attorney Diann Sheridan testified that at about 7 p.m. on May 30, 1992, she spoke with respondent and his mother for approximately one-half hour in an interview room at the police station. Youth officer D. Hall and Detective Joseph Fine were also in the interview room. After she advised respondent of his *Miranda* rights, he agreed to waive those rights and speak with her. She then took the following written statement from defendant in her own handwriting:

"After being advised of his Constitutional rights, and stating he understood each of those rights, and after being advised that he did not have to talk to [Sheridan] and also understanding that Diann Sheridan was an Assistant State's Attorney, a lawyer and prosecutor and not his lawyer, [respondent] agreed to give a truthful account of what happened on May 28th, 1992.

[Respondent] states that he is 13 years old and goes to Libby school. [Respondent] states that he can understand English but cannot read very well. [Respondent] agrees to have his mother, Geraldine Collins, read him this statement so he can understand it.

[Respondent] understands that he will be going to juvenile court and a judge then will decide whether he should go to adult court. [Respondent] states that his nickname is Bey. [Respondent] states on May 28th, 1992 at around 8:00 at night, he was at 5447 S[outh] Indiana [in] Chicago. [Respondent] states that Pooh-pooh, also known as Othineo Lucas[,] had hidden his drugs at an abandoned building. [Respondent] states that a man, Skip, had gone into the building and took Pooh-pooh's drugs. [Respondent] states that Pooh-pooh had a gun also in the building and Pooh-pooh went to get the gun when he found out the man, Skip, had taken his drugs. [Respondent] states that Pooh-pooh said he was going to kill the man for taking his drugs. [Respondent] states he was with Juan

Hodges and they each picked up a stick and hit the man who took the drugs. [Respondent] states he hit the man in the arm and Juan hit him in the head[,] but the stick broke. [Respondent] states that Pooh-pooh came out of the building with the gun and shot the man. [Respondent] states he heard the gun go off four times. [Respondent] states he and Juan and Pooh-pooh all ran away.

[Respondent] states that no one threatened him or promised him anything. [Respondent] states that he was asked if he needed to go to the bathroom but didn't have to go. [Respondent] states that he doesn't use any drugs or drink alcohol. [Respondent] understands that he can add anything or change anything by asking Diann Sheridan or his mother, Geraldine Collins, to do so now. [Respondent] states that there were two other people with Skip. [Respondent] states that Pooh-pooh shot four times at Skip while Skip was running away. [Respondent] states that Pooh-pooh then fired some shots at the other two people."

Each person in the interview room signed each page of the statement.

Following Sheridan's testimony, the parties stipulated that the medical examiner, Dr. Konacki, would testify that the cause of Long's death was a gunshot wound to the back.

After the State and respondent both rested, the circuit court found that the State had satisfied its burden on both counts of the petition, but noted that they "merge[d] for one count of delinquency." Following a dispositional hearing, the court found that it was in respondent's best interests that he be adjudicated a ward of the court. The court also stated that he was a danger to the community and committed him to the custody of the Department of Corrections in order to protect the public's safety. This appeal followed.

█ Respondent first contends that the circuit court's finding that he knowingly and intelligently waived his *Miranda* rights when he made the statement to Assistant State's Attorney Sheridan was manifestly erroneous. He asserts that because of his limited mental ability, he was unable to grasp the meaning of the warnings and therefore could not possibly provide a knowing and intelligent waiver. The State responds that respondent has waived this issue by failing to include it in his post-trial motion. In the alternative, the State maintains that the court's determination was correct because respondent was "Mirandized" numerous times, he indicated that he understood his rights, both he and his mother signed the statement, and he testified that he understood his rights.

Initially, we note that there is a split among the appellate districts regarding whether waiver applies to juvenile proceedings. The fourth district has held that waiver principles apply equally in juvenile cases and criminal cases. (See *In re T.L.B.* (1989), 184 Ill.

App. 3d 213, 219, 539 N.E.2d 1340, *appeal denied* (1989), 127 Ill. 2d 617, 545 N.E.2d 132; *In re F.L.W.* (1979), 73 Ill. App. 3d 355, 358, 391 N.E.2d 1070.) In contrast, the first district has held that waiver does not apply to appeals from delinquency proceedings under the Juvenile Court Act. (See *In re C.L.* (1989), 180 Ill. App. 3d 173, 176-77, 534 N.E.2d 1330 (holding that Supreme Court Rule 660(a) (107 Ill. 2d R. 660(a)), which provides that appeals from delinquency proceedings are to be "governed by the rules applicable to criminal cases," applies only to other supreme court rules and not to rules codified in the Code of Criminal Procedure or general rules of criminal trial practice); see also *In re W.D.* (1990), 194 Ill. App. 3d 686, 700, 551 N.E.2d 357, *appeal denied* (1990), 132 Ill. 2d 545, 555 N.E.2d 386, citing *C.L.*, 180 Ill. App. 3d 173, 534 N.E.2d 1330.) Because we do not agree with the rationale of the first district cases, we hold, as the fourth district did, that waiver does apply to appeals from delinquency findings and that respondent has waived this issue by failing to include it in his post-trial motion. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Furthermore, respondent's contentions fare no better under a plain error analysis.

Prior to the adjudication, respondent moved to suppress his statement on the grounds that it was "not made upon a knowing and intelligent waiver of his right against self-incrimination." At the hearing on the motion, Dr. Dianne Stone, a school psychologist for the Chicago public schools, was found to be an expert in psychological testing and the understanding of *Miranda* warnings by minors. Stone stated that she conducted a complete psychological evaluation of respondent as well as a review of his school records. She determined that he functioned academically at a first- or second-grade level, referring to him as "virtually a non-reader." She also determined that his IQ was 47. She stated, however, that she suspected he was "mildly retarded" rather than "moderately retarded" as his scores would indicate, because the scores were artificially low due to stress. She concluded that his level of comprehension of things which are spoken to him was that of a 6-year-10-month-old child. She then stated that he could only understand select words in the *Miranda* warning and was unable to understand the meaning of the entire sentence because it was too "abstract." In her opinion, he could not understand the words "present," "right," "statement," or their aggregate meaning. Furthermore, she opined that he was incapable of understanding the consequences of waiving his rights when he spoke with the police.

Respondent's mother testified that on May 30, 1992, at 2:30 a.m.,

two police officers came to her house and asked for respondent. She told them that he was at his sister's house, but that she would bring him to the police station the following day. That afternoon, she picked respondent up from school and took him to the police station at 39th and California, where she knew two of the officers. Those officers then took her and respondent to the station at 51st and Wentworth, where she met the two officers from the night before. Those two officers then took her and respondent to an interview room and began asking them about a murder. At that time, she told her son "to tell the truth." Respondent then told the officers what he saw and what happened. An assistant State's Attorney then came into the room and respondent told her what happened while the attorney wrote it down. When respondent was finished, the attorney left the room and went into the hall with the two officers. A short time later, the attorney returned and told respondent to sign some papers. The attorney did not show the papers to either her or her son, but did read them out loud to them. Both she and respondent then signed all three pages which the attorney told them to sign.

Respondent also testified. In order to establish that he was incapable of understanding his *Miranda* warnings, the public defender asked him what certain sentences meant.

"Q. [W]hat is a Public Defender?
A. Somebody that helps you.

* * *

Q. I understand that I have the right to remain silent and anything that I say can be used against me in a court of law. Could you tell the judge what that means?

* * *

A. That I can—that I commit a crime or something.
Q. I understand that I have the right to talk to a lawyer and have him present with me during questioning and if I cannot afford to hire a lawyer, one will be appointed by the court, to represent me, before any questioning.
A. That the State was going to give me a lawyer."

Moreover, when he was asked what the word "right, r-i-g-h-t" meant, he first began making a "scribbling" motion with his right hand, and then said that he did not know what it meant. On cross-examination, however, he stated that he did not ask the officers to explain his rights to him because they were already doing so and because "he already knew and understood what they were saying."

Assistant State's Attorney Diann Sheridan testified for the State that when she met respondent at the police station, she first introduced herself and then advised him of his rights in both the

standard form and a simplified version. They spoke for approximately 30 minutes and then she asked him if she could write down what he had told her. He agreed, and then she told him that he would have the opportunity to read what she wrote. He said that he could not read well, so she told his mother that she could read it for him and left the room to write out the statement. When she came back, youth officer Hall and Detective Fine were in the room with respondent and his mother. She then offered respondent's mother the opportunity to read the statement, but she refused, stating that she did not read well either, and asked Sheridan to read it for them. After she read the statement out loud, respondent said that he had forgotten something and added the part that Skip was with two other people and that Pooh-pooh shot at them after he shot at Skip. Respondent then signed the statement at the end of the last page, and everyone else in the room signed as witnesses. She stated that she had no trouble communicating with respondent, noting that he gave appropriate, unambiguous answers to her questions. On cross-examination she stated that she had never asked respondent to explain what his rights meant, because she thought "he was just a normal 13 year old who had trouble reading."

Chicago police detective Joseph Fine testified that he met respondent's mother at her house at about 2:30 a.m. on May 30, 1992, and told her that he wanted to talk to respondent about a murder. The next afternoon, his mother brought respondent to the station. Respondent was "Mirandized" and indicated that he understood his rights. After respondent began discussing the incident, Fine told him that his version of the events could not be true. His mother then told her son to tell the truth. Respondent revised his version and Fine called for Sheridan. Sheridan arrived, advised respondent of his rights in a simple manner, and then took a statement from respondent. Fine did not notice anything unusual about respondent.

Chicago police officer Mark Mizula testified that on July 18, 1991, he brought respondent into the station on a disorderly conduct charge. Respondent and two other youths were harassing people for money on an elevated train platform. He advised respondent of his rights, and respondent indicated after each right that he understood. He never indicated to Mizula that he did not understand something.

Chicago police officer Alfred Thome testified that he had had several encounters with respondent over the previous three or four years, including arrests for attempted armed robbery and aggravated battery. He had "Mirandized" respondent twice during that time, and respondent stated that he understood his rights. Respondent never appeared confused, and at one time invoked his right to remain silent.

The circuit court found that respondent understood his *Miranda* rights and denied his motion to suppress. On appeal, respondent contends that the circuit court's ruling was manifestly erroneous.

Illinois law is well settled that a reviewing court will not disturb a circuit court's finding on a motion to suppress unless it is manifestly erroneous. (*People v. Gacho* (1988), 122 Ill. 2d 221, 234, 522 N.E.2d 1146, *cert. denied* (1988), 488 U.S. 910, 102 L. Ed. 2d 252, 109 S. Ct. 264; *People v. Neal* (1985), 109 Ill. 2d 216, 218, 486 N.E.2d 898.) Moreover, the determination of whether a knowing and intelligent waiver of *Miranda* rights has occurred depends upon the totality of the circumstances, with no single fact being dispositive. (*People v. Reid* (1990), 136 Ill. 2d 27, 54-55, 554 N.E.2d 174.) While mental capacity is an appropriate consideration, mental deficiency alone will not automatically render a confession involuntary (*In re Willis* (1980), 89 Ill. App. 3d 347, 352, 411 N.E.2d 1126), and the trier of fact is not obligated to accept the opinion of psychologists or psychiatrists. (*In re Morris* (1977), 49 Ill. App. 3d 284, 290, 364 N.E.2d 958.) Instead, where conflicting evidence exists, it is the function of the circuit court in a hearing on a motion to suppress to resolve that conflict. *People v. Redd* (1990), 135 Ill. 2d 252, 289, 553 N.E.2d 316.

■ In the instant case, the circuit court was presented with conflicting testimony as to respondent's ability to understand the *Miranda* warnings. While Dr. Stone did a thorough evaluation of defendant, the court was not required to accept her conclusions. Furthermore, respondent himself gave conflicting testimony, at one point saying that he did not understand the words used, while at another stating that he never sought an explanation because he understood what the police were telling him. Finally, the testimony of the three police officers and the assistant State's Attorney demonstrates that respondent understood what his rights were and was capable of waiving them knowingly and intelligently. Accordingly, we cannot conclude that the circuit court's finding that respondent knowingly and intelligently waived his *Miranda* rights was manifestly erroneous.

■ Respondent also contends that the State failed to prove beyond a reasonable doubt that he was accountable for murder. He asserts that "the only evidence to prove [him] guilty beyond a reasonable doubt was [his] 'statement' *** [which] falls far short of proving beyond a reasonable doubt that [he] was guilty of first-degree murder." He maintains that the statement is inadequate to support a finding of delinquency because it leaves many questions unanswered: the time frame of the events; whether or not respondent knew or was with Lucas prior to the shooting; what respondent was doing at that

location; whether respondent knew Lucas had a gun in the building; whether he knew Lucas was going to get the gun; whether he intended to assist Lucas; and whether he intended to kill Long. In response, the State asserts that respondent was proved accountable for the murder beyond a reasonable doubt because respondent's statement demonstrated that he beat Long with a stick while Lucas went to get the gun, remained on the scene during the shooting, did nothing to aid Long, and fled the scene with Lucas. The State further maintains that respondent's statement was corroborated by the medical examiner's report and Officer Gale's description of the crime scene.

The law is well established that the State must prove the elements of the substantive offenses alleged in delinquency petitions beyond a reasonable doubt. (See *In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068; see also Ill. Rev. Stat. 1991, ch. 37, par. 805—18 (now codified as 705 ILCS 405/5—18 (West 1992)).) When the sufficiency of evidence is challenged on appeal, a circuit court's determination will be overturned only if the reviewing court finds, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 798, 110 S. Ct. 3290.

In the instant case, respondent was found accountable for first-degree murder.

"A person is legally accountable for the conduct of another when

\* \* \*

(c) [e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1991, ch. 38, par. 5—2(c) (now codified as 720 ILCS 5/5—2(c) (West 1992)).)

The circumstances surrounding the crime can be sufficient to prove the existence of a common purpose. (*People v. J.H.* (1990), 136 Ill. 2d 1, 17, 554 N.E.2d 961.) Furthermore, continuing a close association with the perpetrators of the crime, failing to report the crime, concealing evidence of the crime, or failing to aid the victim may be demonstrative of a common purpose. (*People v. Watts* (1988), 170 Ill. App. 3d 815, 825, 525 N.E.2d 233.) Moreover, a finding of accountability for murder may stand even if no proof exists of an intent to kill. *People v. Kessler* (1974), 57 Ill. 2d 493, 497, 315 N.E.2d 29, *cert. denied* (1974), 419 U.S. 1054, 42 L. Ed. 2d 650, 95 S. Ct. 635.

Here, the State presented evidence that Carey Long was shot in the head and back at 5447 South Indiana in Chicago on May 28, 1992, at approximately 8 p.m. More importantly, however, respondent's statement demonstrated that he knew Long took Lucas' drugs from the building and then heard Lucas state that he was going "to kill" the person who stole his drugs. Respondent also knew that Lucas had the gun and saw him get it from the building. Finally, when he and Hodges began beating Long with sticks while Lucas went to get the gun, he prevented Long from escaping and thereby facilitated the commission of the murder. We therefore conclude that the evidence was sufficient to find respondent accountable for murder.

■ Respondent's next contention is that the circuit court improperly found him delinquent for two counts of murder where the evidence indicated that only one man was killed. He asserts that "[i]t is fundamentally unjust to allow the record falsely to reflect that [he] is guilty of two murders."

It is axiomatic that "where one individual is murdered, there can be only one conviction of murder and the judgment may be entered on only one count." (*People v. Montes* (1989), 192 Ill. App. 3d 874, 884, 549 N.E.2d 700, *appeal denied* (1990), 132 Ill. 2d 551, 555 N.E.2d 383.) However, juvenile proceedings are not criminal in nature. (*People v. Beasley* (1977), 66 Ill. 2d 385, 390, 362 N.E.2d 1024, *cert. denied* (1978), 434 U.S. 1016, 54 L. Ed. 2d 761, 98 S. Ct. 734.) Instead, only one finding of delinquency can be entered upon the filing of a single petition for adjudication of wardship, even if it is predicated upon multiple offenses arising from the same conduct. (*In re Mareno* (1976), 43 Ill. App. 3d 556, 558, 357 N.E.2d 592.) In *Mareno*, this court rejected an issue identical to the one in the instant case. There, the minor was found delinquent on the basis of one count of aggravated assault and one count of criminal damage to property which arose from his firing of a shotgun. On appeal, the court noted that multiple convictions based on the same conduct are improper in the criminal context, but stated that no such impropriety occurs in a juvenile case where the circuit court makes only one finding of delinquency. *Mareno*, 43 Ill. App. 3d at 558; see also *In re S.D.S.* (1982), 103 Ill. App. 3d 1008, 1015, 431 N.E.2d 759, *cert. denied* (1982), 459 U.S. 869, 74 L. Ed. 2d 128, 103 S. Ct. 153 (rejecting the minor's contentions that the circuit court improperly entered findings on both solicitation to commit murder and conspiracy to commit murder because unlike a criminal conviction, the dual findings could not result in a longer commitment to the Department of Corrections).

In this case, as in *Mareno*, only one finding of delinquency was entered even though the court found that the State satisfied its

burden on both counts. We therefore find no error in the circuit court's order.

■ Respondent's last contention is that the circuit court abused its discretion in committing him to the custody of the Department of Corrections because it failed to consider the less restrictive alternatives such as home confinement, probation, a therapeutic day school or a residential educational placement, or some combination thereof. He asserts that the court's disposition was in "complete disregard" of the expert's recommendations and was "the one disposition that all the evidence showed to be improper." The State responds that the disposition was a proper exercise of discretion and was necessary to protect the community.

At the dispositional hearing, probation officer Frances Bruce testified that she did not believe respondent was harmful or criminal and recommended that he be placed on probation for five years. She also recommended that he be placed in a therapeutic day school immediately and a residential educational placement in the future. Finally, she suggested that he be subjected to two months of home confinement and that both he and his family undergo counseling. She also stated that the Department of Corrections would be inappropriate for this minor because it would not provide the necessary educational environment for him.

Dr. Stone testified that respondent needed specialized educational services and recommended that he be placed on probation. She also stated that commitment to the Department of Corrections would be inappropriate because respondent's mental age was that of a seven year old and she "could not see sending a 7-8 year old child to [the Department of Corrections]."

Probation officer and educational advocate Carol Zientak testified that a therapeutic day school placement would be inappropriate. Instead, she recommended that respondent be placed in a residential program in conjunction with probation. She stated that he was receiving the specialized education indicated by his Individualized Education Plan (IEP) at the school at the juvenile detention center, and that the Department of Corrections would be required by law to follow the IEP if respondent was committed there.

Finally, Dr. Nancy Feys, chief psychologist for the juvenile court, recommended that he be placed in a therapeutic day school, coupled with family counseling. She stated that respondent was not a danger to himself or the community if he received the proper treatment.

The disposition of a minor rests within the sound discretion of the circuit court, and a reviewing court will not disturb that decision absent an abuse of that discretion. (*In re J.C.* (1987), 163 Ill. App. 3d

877, 886, 516 N.E.2d 1326, *appeal denied* (1988), 119 Ill. 2d 566, 522 N.E.2d 1251.) When determining the appropriate disposition, the circuit court may choose as it sees fit, among the various alternatives, and not defer to any particular recommendation. (*In re T.A.C.* (1985), 138 Ill. App. 3d 794, 797-98, 486 N.E.2d 375.) However, because delinquency proceedings are protective rather than punitive in nature, "[c]ommitment is to be used only when less severe placement alternatives would not be in the best interests of the minor and the public." *In re B.S.* (1989), 192 Ill. App. 3d 886, 891, 549 N.E.2d 695.

In the instant case, the circuit court carefully considered the proposed options and determined that it was in respondent's best interests to be adjudicated a ward of the court and that commitment to the Department of Corrections was "necessary to ensure the protection of the public from the consequences of criminal activity of the delinquent." (Ill. Rev. Stat. 1991, ch. 37, par. 805—33(1)(b) (now codified as 705 ILCS 405/5—33(1)(b) (West 1992)).) In light of the violent nature of the offense, we cannot conclude that the other proposed options would satisfy the dual purpose of providing for the educational needs of respondent as well as protecting the public. However, because the Department of Corrections is required to provide for his special educational needs (see Ill. Rev. Stat. 1991, ch. 38, par. 1003—9—1(a) (now codified as 730 ILCS 5/3—9—1(a) (West 1992)) (requiring "[a]ll institutions or facilities housing persons of such age as to be subject to compulsory school attendance" to establish educational programs which provide elementary and secondary school education equivalent to the completion of the twelfth grade in the public school systems); 20 Ill. Adm. Code § 405.20(a)(2)(c) (1992) ("Juvenile Division educational programs shall include *** Special education")), both the interests of the minor and the public are served. Moreover, after examining respondent and determining his needs, the Department of Corrections may order "referral to the Parole and Pardon Board as often as it deems desirable" (Ill. Rev. Stat. 1991, ch. 38, par. 1003—10—2(b)(3) (now codified as 730 ILCS 5/3—10—2(b)(3) (West 1992))), and it must reexamine him at least once each year in order to determine if his needs have changed. (Ill. Rev. Stat. 1991, ch. 38, par. 1003—10—2(c) (now codified as 730 ILCS 5/3—10—2(c) (West 1992)).) Accordingly, we hold that no abuse of discretion occurred when the circuit court committed respondent to the custody of the Department of Corrections.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.