THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID LEE, Defendant-Appellant.

First District (4th Division) No. 83—989

Opinion filed November 8, 1984.—Rehearing denied December 13, 1984.

Steven Clark and Scott Graham, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Jane E. Liechty, and Mary Ann Sullivan, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LINN delivered the opinion of the court:

A jury in the circuit court of Cook County found the defendant, David Lee, guilty of rape. He was sentenced to a prison term of six years. On appeal, defendant claims that (1) his statement to a court-appointed psychologist during a fitness and sanity examination should have been held inadmissible to impeach his testimony; (2) the misrepresentation to defendant by an assistant State's Attorney that defendant's fingerprints had been found in complainant's apartment rendered his subsequent confession involuntary; (3) the prosecutor's prejudicial remarks during cross-examination of defendant and closing argument

denied defendant a fair trial; and (4) evidence of his demotion in rank while in the army should not have been admitted.

We reverse and remand the case for a new trial.

FACTS

At trial, complainant testified that on the evening of November 13, 1981, she and her young daughter had fallen asleep while watching television in the front room of their apartment. Although she was sure she had locked the front door after taking her dog for a walk, she awoke when the dog began barking at a man who had entered the apartment. She struggled with the intruder, but he held a knife to her face, told her to keep quiet, and began pushing her across the room. In the light from the kitchen window, she recognized her assailant as David Lee, a former co-worker of hers at National Van Lines with whom she had maintained contact after he left the company.

Holding the complainant in a headlock, Lee forced her into the bedroom and onto the bed, placed some blankets over her head, and removed her velour shirt and jeans. After forcible intercourse, he pushed her into the closet and told her he would kill her if she came out. When she heard the front door close, she pulled on a robe and awakened her daughter. She first called Robert Buti, her supervisor at work, and then called the police.

According to complainant, she had met Lee when she was assigned to train him as a data processor, and once they had drinks together in the data processing room. Lee had made several unsuccessful advances toward her, and once he came to her home to lend her a book on an unfamiliar computer language she was trying to learn. Complainant testified that Lee's actions on the night in question were "meaner" than they had ever been in the past.

The remaining evidence in the State's case pertinent to this appeal was presented through two witnesses, Bob Buti and the felony-review assistant State's Attorney, who had interviewed defendant after his arrest and obtained his confession. Over objection, Buti related his phone conversation with complainant after her assailant had left the apartment, stating that she had said someone had broken into her apartment. He then described his actions after he and the police arrived at the victim's apartment. Although Buti recalled noticing that the inside woodwork on the side of the door had come off, the police found no evidence of a forced entry.

The assistant State's Attorney, who had also testified during the hearing on Lee's unsuccessful motion to suppress his statement, related that he had been called to come to the Northlake police station to ques-

tion Lee, who had been transferred from Maywood and was then in the custody of Detective DiIulio. According to the assistant State's Attorney, he read Lee his *Miranda* rights, and Lee agreed to make a statement. During the next 20 to 25 minutes, Lee denied being at complainant's apartment on the night in question. However, when the assistant State's Attorney said that he had been positively identified and then misrepresented to Lee that his fingerprints had been found on the scene, Lee admitted that he had been in the apartment and went on to make several inculpatory statements, all of which were the subject of his unsuccessful motion to suppress. However, he did not admit to having intercourse with complainant.

Lee's version of the events of November 13-14, 1981, and of his arrest and questioning was quite different from that presented by the State. Lee testified that he and the complaining witness had had an ongoing sexual relationship during the time they worked together, and they also had intercourse on the night he brought her the programming book. According to Lee, on the night in question he had been drinking with some new acquaintances when he decided to call complainant. She told him to come over in a couple of hours after her daughter had fallen asleep, and said that she would leave the door open. When he arrived, they embraced, went into the bedroom, and undressed. During their lovemaking, complainant suddenly became passive and began talking about Bob Buti, with whom she had been romantically involved.

At this point, Lee testified, he had a flashback to a humiliating experience he had had in an Okinawa brothel during his tour of duty in Vietnam, and he began to abuse the complainant verbally and to treat her roughly. She became upset and ordered him to leave, which he did. Lee subsequently went out of town to attend a funeral, and when he returned several days later to learn that a warrant had been issued for his arrest, he surrendered to the police.

Lee further testified that after he was taken from Maywood to the Northlake police station, he was first placed in a room with six officers; later, he was put in the custody of Detective DiIulio, who handed him a paper and told him to sign it "to save a lot of trouble." DiIulio then told him he was wanted for raping a white girl.

When the assistant State's Attorney arrived, he noted the signed waiver form, gave Lee his *Miranda* warnings, and began the questioning. After Lee persisted in denying that he had been in complainant's apartment on the night in question, the assistant State's Attorney offered to continue the questioning in the room with the six officers, and Lee began to fear bodily harm. Finally, when the assistant State's Attorney told him that he had been positively identified and then know-

ingly misrepresented to Lee that Lee's fingerprints had been found in the apartment, Lee broke down and confessed that he had gone to complainant's apartment and had frightened her into undressing, but he denied having intercourse with her because he had been too intoxicated to achieve an erection.

Although Lee had filed and argued a motion to suppress his confession, the trial court denied the motion on the ground that nothing that had occurred during the questioning would be likely to produce an untrustworthy confession, and under the totality of the circumstances the statement was voluntary.

As part of his defense, Lee offered the testimony of Dr. Robert DeVito, a psychiatrist who had examined Lee after his arrest. According to DeVito, Lee was suffering from post-traumatic stress syndrome, a recognized disorder, most often found in war veterans, that is characterized by "flashbacks" to an earlier stressful situation and resulting behavior patterns inappropriate in the current circumstances. It was DeVito's conclusion that the original stressor in Lee's situation was his assignment to graves registration duty during the Vietnam war, a position in which he prepared dead bodies for shipment, sometimes by reassembling dismembered corpses. During this generally stressful period, the humiliating experience at the Okinawa brothel occurred, and it was DeVito's opinion that Lee could have suffered a flashback during intercourse with complainant. He concluded by stating that in his opinion, on the night in question Lee was able to conform his conduct to the requirements of the law.

In rebuttal, and over vigorous defense objection, the State presented the testimony of Dr. Lisa Grossman, a clinical psychologist who had interviewed Lee at the court's direction after Lee indicated in his answer to discovery that he might raise an insanity defense. Lee protested that the State was statutorily prevented from introducing his statement to Grossman because he had decided not to raise the defense of insanity. However, the court ruled that Lee "had created the situation" by presenting Dr. DeVito's testimony, and therefore "fundamental fairness" required that the State be allowed to use his statement to Dr. Grossman for impeachment purposes.

Dr. Grossman then testified that Lee told her that he had been drinking heavily on the evening of November 13. He became increasingly angry at complainant over a problem she had created for him at work. He thought he wanted to beat her up, so he went to her apartment, and she let him in. Lee said that they went into the bedroom, where he put his hand under her robe, but he did not remember anything further except that he heard voices telling him to "get her, kill

her, choke her, beat her." He also commented to Grossman that the pen he carried was a good weapon because it was untraceable.

Following closing arguments, the jury returned a verdict of guilty, and Lee was sentenced to six years of imprisonment. This appeal followed.

OPINION

I

■ Defendant's first contention on appeal is that the trial court's decision to allow the testimony of Dr. Grossman was error sufficiently prejudicial to deny him a fair trial. We agree.

Section 104—14 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 104—14(a)) provides:

> "Statements made by the defendant and information gathered in the course of an examination or treatment ordered under Section 104—13, 104—17 or 104—20 shall not be admissible against the defendant until he raises the defense of insanity or the defense of drugged or intoxicated condition, in which case they shall be admissible only on the issue of whether he was insane, drugged or intoxicated."

Contrary to the trial court's ruling, we do not find that defendant raised the defense of insanity. Instead, the testimony of his expert, Dr. DeVito, was intended to establish that defendant did not have the mental state necessary for the crime of rape. Because rape is a general intent crime that does not require an allegation of a specific mental state (*People v. Gold* (1967), 38 Ill. 2d 510, 232 N.E.2d 702, *cert. denied* (1968), 392 U.S. 940, 20 L. Ed. 2d 1400, 88 S. Ct. 2316), the State had to prove that defendant acted (1) with intent to rape, (2) with knowledge that his conduct was that defined as rape, or (3) with reckless disregard for the unjustifiable risk that his actions would constitute rape. Ill. Rev. Stat. 1981, ch. 38, pars. 4—4, 4—5, 4—6.

In his statements to Dr. DeVito and in his testimony at trial, defendant maintained that he and complainant had engaged in consensual intercourse until her comment triggered his flashback, at which point he became rough and verbally abusive. Dr. DeVito's testimony, therefore, was intended to establish that defendant did not exhibit any of the culpable mental states and that defendant's claim of consensual intercourse could be compatible with complainant's accusation of nonconsensual intercourse.

Having found that defendant did not raise a defense based on insanity, we are forced to conclude that the trial court's ruling admitting the

testimony of Dr. Grossman for impeachment purposes was a violation of the absolute prohibition contained in the statute quoted above. The restrictions contained in the statute are derived from a defendant's fifth amendment privilege against self-incrimination (U.S. Const., amend. V) and clearly forbid the use of such statements in any circumstance other than those specifically set forth.

The content of Dr. Grossman's testimony was so damaging and prejudicial that we cannot say that the outcome of the trial would have been the same absent that testimony. A judgment of conviction will not be reversed merely because error was committed at trial unless it appears that the finding of guilt may have resulted from such error. (*People v. Morehead* (1970), 45 Ill. 2d 326, 259 N.E.2d 8, *cert. denied* (1970), 400 U.S. 945, 27 L. Ed. 2d 251, 91 S. Ct. 251.) "Where the evidence in a criminal case is erroneously admitted, such error is presumed to affect the result unless the evidence is such that there is no other conclusion than that of guilt." (*People v. Sisti* (1967), 87 Ill. App. 2d 107, 112, 230 N.E.2d 500, 503.) Accordingly, we reverse the conviction of defendant and remand the case for another trial from which testimony concerning the psychiatric examination will be barred unless the statutory requirements are met.

## II

■ Defendant's second claim on appeal is that the misrepresentation concerning his fingerprints, made by the assistant State's Attorney during questioning, rendered his confession involuntary and therefore inadmissible. We agree.

Prior to trial, defendant filed a motion to suppress his confession, alleging that the statement had resulted from the impermissible mental coercion of defendant by the assistant State's Attorney. (*People v. Gunn* (1973), 15 Ill. App. 3d 1050, 305 N.E.2d 598.) "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver [of his fifth amendment privilege against self-incrimination] will, of course, show that the defendant did not voluntarily waive this privilege." (*Miranda v. Arizona* (1966), 384 U.S. 436, 476, 16 L. Ed. 2d 694, 725, 86 S. Ct. 1602, 1629.) Similarly, the Illinois Supreme Court has established that a confession obtained through trickery is inadmissible. *People v. Stevens* (1957), 11 Ill. 2d 21, 141 N.E.2d 33.

The test by which the voluntariness of a confession is to be measured is found in *People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731:

"Whether a statement is voluntarily given depends on the total-

ity of the circumstances. The test is whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. *** [T]he finding of the trial court that the statement was voluntary will not be disturbed unless it is contrary to the manifest weight of the evidence."

It is true that, in other contexts, courts have considered the police tactic of misinformation and have found no constitutional violation. (*People v. Moore* (1981), 105 Ill. App. 3d 264, 434 N.E.2d 300.) Our examination of these cases, however, reveals that of the various subterfuges employed during the questioning process, those deemed harmless involved speculative statements made by the questioner concerning evidence against the defendant. For example, in *People v. Boerckel* (1979), 68 Ill. App. 3d 103, 385 N.E.2d 815, *cert. denied* (1980), 447 U.S. 911, 64 L. Ed. 2d 861, 100 S. Ct. 2998, the detective never told defendant that his fingerprints had been recovered from the victim's residence. "He merely told defendant that some fingerprints had been found and that he believed they could be defendant's." (*People v. Boerckel* (1979), 68 Ill. App. 3d 103, 111, 385 N.E.2d 815, 822.) Similarly, in *In re Willis* (1980), 89 Ill. App. 3d 347, 411 N.E.2d 1126, the police indicated that they had some fingerprints and that they knew defendant had been at the scene, but they never represented that the fingerprints were those of defendant. In *People v. Griffith* (1976), 40 Ill. App. 3d 690, 353 N.E.2d 53, the police merely told defendant that fingerprint evidence would reveal whether or not defendant had removed complainant's underpants, and the misrepresentation that witnesses had seen him occurred only after defendant had admitted having intercourse with the victim.

In contrast, in the instant case, defendant was told positively that his fingerprints had been found in the complainant's apartment. Such a knowing lie is far more coercive than the speculative statements made in the cited cases. (See *People v. Payton* (1984), 122 Ill. App. 3d 1030, 462 N.E.2d 543.) Additionally, as noted in *Jackson v. Denno* (1964), 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774, the truth or falsity of the confession is irrelevant insofar as the inquiry into its voluntariness is concerned. Accordingly, we find that the confession made by defendant in response to the knowing misrepresentation made by the assistant State's Attorney was rendered involuntary and therefore inadmissible.

### III

Of the several other claims of trial error raised by defendant, we

conclude that none standing alone would amount to reversible error. However, we choose to discuss those errors likely to reoccur in a subsequent trial in order to prevent possible further litigation on those issues.

■ First, the hearsay statements made by complainant to Bob Buti over the telephone should not have been admitted. Although it is true that a victim's claim of rape made immediately after the attack is admissible as a spontaneous declaration corroborating her accusation of rape (*People v. Belcher* (1980), 92 Ill. App. 3d 237, 415 N.E.2d 1120), the complainant in the instant case made no claim of rape in her call to Buti. All she said was that someone had broken into her apartment. Without a specific claim of rape, the conversation did not qualify under any other exception to the hearsay rule whereby a prior corroborative statement is admissible, *i.e.*, a recent fabrication or a motive to falsify. (*People v. Buckley* (1976), 43 Ill. App. 3d 53, 356 N.E.2d 1113.) Further, the statement was not admissible as a spontaneous declaration, since at trial the State did not lay the necessary foundation of an absence of opportunity to fabricate the statement. (See *People v. McKee* (1977), 52 Ill. App. 3d 689, 367 N.E.2d 1000.) In light of defendant's assertion that the intercourse was consensual, any improperly admitted evidence tending to show otherwise unfairly prejudiced the defendant.

■ Next, defendant claims that the trial court erred in overruling his objection to the State's comment that defendant did not call as witnesses certain doctors to whom he allegedly had told the details of the Okinawa brothel incident during his hospitalization for psychiatric treatment. The names of these potential witnesses were revealed by defendant in his supplemental answer to the State's request for discovery. It was therefore improper for the State to comment unfavorably on the failure of defendant to produce witnesses equally available to the State, for such remarks unfairly tend to shift the burden of proof to the accused. *People v. Nodal* (1980), 89 Ill. App. 3d 538, 411 N.E.2d 1087.

It was also improper for the prosecutor to phrase his questions of defendant on cross-examination in such a way that defendant was forced to state by implication that he had committed other criminal acts. For example, although defendant's objection to the State's question "And you didn't go out and rape anyone else, did you?" was sustained, the prosecutor continued by saying, "You never went out and raped anyone in Okinawa?" Similarly, although there was no evidence that defendant had ever used narcotics, the prosecutor asked defendant if he had taken narcotics before going to the police station, thus

implying that defendant used narcotics. The prosecution also called defendant a "con-man" for not requesting psychiatric help until after his arrest when "he had the advice of counsel," and then repeatedly labelled defendant a liar. All of these tactics have been deemed prejudicial error. (*People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880 (improper implication of other criminal acts); *People v. McCommon* (1979), 79 Ill. App. 3d 853, 399 N.E.2d 224 (improper mention of narcotics); *People v. Broadnax* (1975), 26 Ill. App. 3d 67, 325 N.E.2d 23 (improper reference to defendant as a liar).) We have no doubt that the cumulative effect of the foregoing improper comments contributed to defendant's failure to receive a fair trial. We trust that these and similar errors will not reoccur during retrial of this case on remand.

As to the question asked of defendant regarding his demotion in rank while in the army, we do not agree with defendant that this evidence improperly informed the jury that he was guilty of prior criminal acts. An army demotion can result from many causes and need not be a result of criminal behavior. Since no details of the incident were allowed into evidence, and defendant himself had presented extensive testimony concerning his army career, we do not find the admission of evidence of his demotion to be error.

For all of the foregoing reasons, we reverse the decision of the trial court and remand this cause for a new trial.

Reversed and remanded.

JIGANTI and ROMITI, JJ., concur.