THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM LENIUS, Defendant-Appellant.

First District (1st Division) No. 1—96—1682

Opinion filed November 24, 1997.

Terrence P. LeFevour, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and William F. Toffenetti, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendant, William Lenius, was convicted of first degree murder, attempted first degree murder, aggravated battery, possession of an explosive or incendiary device, and aggravated arson and sentenced to concurrent terms of natural life imprisonment for first degree murder and 30 years for attempted murder, as well as concurrent terms of seven years' imprisonment for aggravated battery and five years for possession of an explosive device. On appeal, defendant cites multiple errors at the pretrial, trial and sentencing phases of his trial. We affirm defendant's conviction.

BACKGROUND

The record reveals the following relevant facts. On August 31, 1993, Ellen Marshall lived with her parents in a townhome located at 8044-A Lyons, Niles, Cook County, Illinois. At about 12:30 p.m., Ellen went out to her car, parked in a lot just north of the townhome, and noticed a red tool box with a key in the lock on the ground behind the left front tire, partly under her car. Ellen moved the tool box out from behind the tire, then drove away.

Debra Conrad and her family lived next door to the Marshalls, at 8044-B Lyons. Debra was employed as a school bus driver for handicapped students. At about 2:30 p.m., on August 31, 1993, Debra left home to pick up the students. As she neared her van, parked in the vicinity of the space vacated by Ellen's car, Debra noticed a tool box on the ground. Ellen returned to the parking lot and told Debra that she had noticed the tool box earlier and that she had pushed it away from her car. Ellen then went into her home.

Debra approached the tool box, and seeing the key in the lock, tried to turn it. She was not able to turn the key. Debra then left to pick up the students.

Upon her return, between 3 and 3:30 p.m., Debra saw that the tool box was still in the parking lot. Debra picked up the tool box and brought it into her home in order to determine its owner.

Debra's husband, Wayne Conrad, was home sitting on the sofa in the living room. Debra handed the tool box to Wayne. She said that

she thought it might belong to a young man who had worked on his car in the parking lot. Debra stated, "Maybe you can open it up and see if the name is in there."

Wayne set the box in his lap. Debra turned to walk from the room to the kitchen, and Wayne said, "I can't get the lock." Debra turned back toward him and replied, "Then let's just forget about it." As she started to turn back toward the kitchen, Wayne said, "I think I got it." Debra turned to face Wayne, and at that moment the box exploded, killing Wayne and the family dog and seriously injuring Debra.

## PRETRIAL MOTIONS

Prior to trial, a combined hearing commenced on defendant's motions to quash arrest and suppress evidence and to suppress statements.

### A. Motion to Suppress Statements

Niles police detective sergeant Dennis McEnerney testified that on August 31, 1993, at 11:10 p.m., he had a conversation with defendant in the tactical office of the Niles police department. Also present were Federal Bureau of Alcohol, Tobacco and Firearms (ATF) Special Agent Cynthia Beebe and Cook County sheriff's police department officer Rewers.

McEnerney read defendant his *Miranda* rights. Defendant stated that he did not understand his right to an attorney. McEnerney explained that if at any time defendant would like an attorney, then the police would stop asking questions and defendant would be allowed to consult with an attorney. Defendant signed a form waiving his rights.

At 2 a.m., McEnerney left defendant alone with Agent Beebe. In between 2 and 3:30 a.m., McEnerney ducked his head into the room two or three times. Agent Beebe never left the office between 11:10 p.m. and 3:30 a.m.

At 3:30 a.m., McEnerney reentered the office and Agent Beebe exited. McEnerney had a conversation with defendant for about half an hour. At 4 a.m., McEnerney left Agent Beebe and defendant in the office, returning again at 4:05 a.m. with Assistant State's Attorney (ASA) Kinnerk, to initiate another conversation with defendant. ASA Kinnerk advised defendant of his *Miranda* rights, and defendant signed a second waiver of rights form. The officers and the ASA then had a second conversation with defendant until 5 a.m., at which time McEnerney and ASA Kinnerk left defendant alone with Agent Beebe.

At no time did defendant request an attorney, nor was defendant promised leniency in exchange for a statement. No officer threatened defendant with either the death penalty, incarceration in the Cook County jail, or both. Defendant was provided with food and drink and was allowed to use the bathroom facilities.

Agent Beebe was alone with defendant from 5 a.m. until 7:40 a.m., on September 1, 1993, at which time defendant was placed in the lockup. Sometime in the late morning or early afternoon, after defendant gave a court-reported statement, an attorney arrived at the police station to see defendant.

ATF Special Agent Cynthia Beebe testified that between 11:10 p.m. and approximately 2 a.m., she took handwritten notes of her interview with defendant. Starting around 2 a.m., defendant became "fairly emotional," red-faced, and leaned forward as though he might say something. Agent Beebe advised defendant that, if he wanted to, he could speak to either her or Sergeant McEnerney alone. At approximately 2:30 a.m., defendant asked Agent Beebe if he could talk to her alone. McEnerney agreed to leave the room.

After McEnerney left, Agent Beebe ceased taking notes but continued her conversation with defendant. At about 3:10 a.m., Agent Beebe started writing notes again, after defendant agreed that she could do so. At one point, Agent Beebe left the room for three to five minutes to speak with McEnerney. After she returned, she continued taking notes of her conversation with defendant.

At approximately 3:30 a.m., defendant allowed McEnerney to return to the room. Agent Beebe made a written indication of the time of the sergeant's return, and shortly thereafter, she concluded writing five pages of notes. Agent Beebe then gave the notes to defendant to read and sign and then to McEnerney to read and initial. At about 9:30 a.m., defendant gave a statement to Agent Beebe, ASA Kinnerk and Niles police officer O'Sullivan in the presence of a court reporter.

Several weeks after the interviews, Agent Beebe arranged to have her handwritten notes typed for ATF reporting purposes. Agent Beebe photocopied the signatures on the original handwritten notes, cut the signatures out of the photocopies, and taped the signatures to the typewritten pages. Agent Beebe stated that the content of the typed notes is identical to the content of the handwritten notes.

Agent Beebe stated that during the initial conversation with defendant, McEnerney told defendant that a woman had been killed. Based on the sergeant's statement, Agent Beebe was not clear whether the sergeant meant Debra Conrad or Ellen Marshall. Agent Beebe admitted that, at one point, McEnerney said that Ellen Mar-

shall was dead, when Agent Beebe knew that Ellen Marshall was not dead. Agent Beebe was confused by the sergeant's statement, and although she did not interrupt him, she made a note of it. Agent Beebe also wrote that when Sergeant McEnerney went to defendant's apartment, he told defendant that Ellen Marshall was dead. Agent Beebe agreed that it was not true that Ellen Marshall was dead.

Niles police officer Joseph O'Sullivan testified that he was present at the time defendant gave his court-reported statement. At the conclusion of the statement, ASA Kinnerk asked defendant to read and sign the statement. However, when defendant reached page 3 of the statement, defendant looked up, said he did not want to sign any more pages, and requested an attorney. Defendant was immediately removed to the lockup. Defendant never reviewed the entire statement.

At 10:05 a.m., Officer O'Sullivan received a telephone call from a person identifying himself as Bob Griffith, an attorney for defendant. Griffith told Officer O'Sullivan that he had been contacted by defendant's employer. Officer O'Sullivan advised ASA Kinnerk of Griffith's telephone call.

At 10:35 a.m., Officer O'Sullivan received a second telephone call from Griffith. Griffith told Officer O'Sullivan that he did not want anyone talking to his "client." Officer O'Sullivan did not remember whether he told ASA Kinnerk about Griffith's second call. At 12:30 p.m., Griffith arrived at the police station and was brought to meet defendant in the lockup.

Defendant testified that on August 31, 1993, at approximately 11 p.m., he was in custody at the Niles police station. McEnerney told defendant that his fingerprints had been found "all over" the device that had exploded. Defendant replied that that was not possible, and the sergeant stated that the fingerprints matched those in defendant's military records.

Defendant told the authorities that he did not know anything about the crime for which he was arrested, at which time Officer Rewers said, "Fuck him, if he is going to be an asshole, send him down there and they will take care of him." Rewers then left the interview room. McEnerney and Beebe told defendant that if he did not "go along," with what they wanted, they would send him down to Cook County jail and have "certain gangs number [him] up," and if he "lived through it," it would "be days before anybody heard from [him]."

Defendant stated that he asked to see an attorney after McEnerney read him his rights. McEnerney asked defendant if he could afford an attorney. Agent Beebe told defendant that he would probably

get the death penalty if he did not go along with what they said because she was a federal agent and had control over the courts. Agent Beebe promised that if defendant cooperated with the authorities, they would talk to doctors and the judge and make sure nothing would happen to him.

When defendant first entered the interview room, they told him that they were investigating the death of Ellen Marshall. Defendant first learned that was not correct early the next morning. At that time, Agent Beebe said, "I have something to tell you may make you mad, but may make you kind of happy." Then she said that Marshall was not dead. Agent Beebe did not tell him who was, in fact, deceased.

Defendant stated that during the course of the night, and into the early morning hours, he requested an attorney close to a dozen times. At about 2:30 a.m., defendant told the authorities that he wanted to lie down and try to sleep because he was tired. Defendant stated that he was not allowed to sleep.

After the sergeant left, defendant and Agent Beebe had a conversation. Then, Agent Beebe asked defendant to sign a sheet of paper in order to "verify" that she had talked to him. Defendant signed the paper, but he did not. read any notes prior to signing anything.

Later, while giving his court-reported statement to the ASA, defendant stopped the proceeding in order to stall for time to acquire representation. Defendant had agreed to give the statement only because he previously had been threatened and denied the right to talk to an attorney. After defendant gave the court-reported statement, he was brought out of the lockup in order to review the typed statement. They handed him one page at a time, he signed only the first two pages, then refused to sign the rest of the statement.

B. Motion to Suppress Evidence

Defendant testified that on August 31, 1993, at approximately 9 p.m., he was in his apartment located at 3321 North Kenneth, Chicago, when the doorbell rang. Defendant descended the rear stairs to answer the door and encountered "at least 10" police officers. Sergeant McEnerney asked defendant if he was Bill Lenius, then told him that they had a search warrant to search his apartment. The sergeant pushed defendant aside, pushed the door open and a few of the officers went upstairs into defendant's apartment. McEnerney did not show defendant an arrest warrant.

The officers entered defendant's apartment ahead of him and without his permission. Two officers remained in the living room, two went into the kitchen, and three went into the bedroom. Defendant

asked what was going on, and McEnerney replied that they were "looking for something." McEnerney refused to show defendant a warrant. McEnerney asked defendant to sign a "verification that they were in fact serving said search warrant." Defendant signed the document, although he could not read it because it was covered by another piece of paper.

Defendant stated that the officers recovered and removed various items from his apartment, but he was not given an inventory of the items removed. McEnerney asked whether his truck was parked in front of the building. Defendant did not give police permission to search his truck. When the sergeant asked defendant if he knew anyone in Niles, defendant mentioned his ex-girlfriend, Ellen Marshall. McEnerney replied that Ellen was dead.

Defendant then reached for the telephone to call Ellen's house to find out "what was going on." McEnerney grabbed defendant's arm and pulled him away from the telephone. The sergeant then ordered defendant to accompany the officers to the Niles police station for the investigation of the death of Ellen Marshall. Defendant said he wanted to straighten up his apartment first and stated that he would go to the police station later with a friend. The sergeant refused and told defendant that he had to accompany the officers. Defendant stated that the officers searched his person without advising him of his *Miranda* rights.

Sergeant McEnerney testified that he learned of the explosion on August 31, 1993, from Ellen Marshall. Ellen also informed officers that, in July 1993, she had received a package, wrapped in brown paper, placed between the screen door and the front door of her parents' home. The return address on the package was "PET Inc," and bore a Chicago address and postmark. Ellen found no listing for such a company in the Chicago telephone directory. Ellen took the package up to her room and unwrapped it and found that it contained a portable stereo-radio. Ellen put the stereo-radio in her closet.

At about 7 p.m., the Cook County bomb squad performed an X ray on the stereo-radio and found that it contained a metal pipe bomb, comprised of a powder ignition source and a motorcycle battery. The components of the bomb included PVC pipe, time caps and nails, bolts through the end caps, and explosive powder. The bomb was powered by an electrical cord. The bomb squad found that the end caps were made from the cap of an Edge shaving cream can. The bomb squad performed a procedure to disarm the bomb and render it safe.

Ellen and her mother, Sybil, told the sergeant that they thought defendant may have directed the bombs at her because Ellen had

ended her relationship with defendant. Ellen stated that shortly after she broke up with defendant, she discovered sugar in the gas tank of her vehicle. Ellen confronted defendant, who replied that he would not do anything to her car; he would harm her instead. Ellen also informed the officers that defendant tinkered with motorcycles, that he was in the United States Navy torpedo school, and that he attended DeVry Institute of Technology for electronics. Ellen told the officers defendant's address.

Eight police officers, including four Niles officers, proceeded to defendant's residence, in search of the components of a pipe bomb. Some of the officers approached the rear of defendant's residence and rang the doorbell, while others waited at the side of the building. Defendant answered the door, and Sergeant McEnerney identified himself and advised defendant of the incident in Niles. Defendant agreed to speak to the officers and allowed the officers to come in, leading the officers up the stairs.

Defendant entered his apartment first, followed by Sergeant McEnerney and Niles police detective Kent Sall, and the other officers. McEnerney noted that the small room was set up with electronic equipment and musical instruments. Defendant told the police that they could look around. The sergeant told defendant that he had to sign a consent to search form. The sergeant did not tell defendant that they had a search warrant to search his apartment.

Detective Sall filled out a consent to search form in the presence of the sergeant and defendant and read the form to defendant. Detective Sall then handed the form to defendant, attached to a folder by a clip. The form was not covered at the time the detective handed it to defendant. Defendant signed the form, and the officers signed the form as witnesses.

The officers found PVC pipe, duct tape and a volt meter in the bedroom. McEnerney observed a can of Edge shaving cream missing its cap in defendant's bathroom. The can color matched the color of the cap that had been found in the stereo-radio bomb.

The officers searched defendant's apartment for approximately an hour and a half, recovering several bags of items from the apartment. The officers then asked defendant if he would accompany them back to the Niles police station. Defendant agreed, after first feeding his cats.

Once outside, defendant gave the officers permission to search his vehicle and handed the officers the keys. McEnerney asked defendant if he wanted to take his own car to the station or ride with the officers. Defendant stated that he would go with the officers in their unmarked squad car.

At the police station, the officers showed the Cook County bomb squad the items they retrieved from defendant's apartment. The items recovered by the police were consistent with the contents of the stereo bomb.

Police secured a search warrant for defendant's residence at 10:30 a.m. on September 1, 1993. Subsequently, police performed a second search of defendant's apartment and recovered additional items.

Sergeant McEnerney denied telling defendant that Ellen Marshall had been killed. He also denied telling Agent Beebe that he had told defendant that Ellen Marshall had been killed. The sergeant stated that he told defendant that there was an explosion near Ellen Marshall's home and that one person had been killed and another person had been injured.

Niles police detective Kenneth R. Sall testified that he provided the consent to search form, a two-sided card, which he read to defendant. Defendant signed the card. Prior to leaving his apartment, defendant showed the officers where he kept his cat food, and Detective Sall fed defendant's cats.

At the conclusion of the hearing on both motions, the trial court found that the police went to defendant's residence to talk to defendant and to search his apartment and that, if defendant had not given consent to search, the officers would have put a guard on the building and obtained a search warrant. The trial court did not believe that defendant "kept signing things just because the police officers said sign" or that defendant repeatedly requested an attorney. The trial court found that attorney Griffith never called the police station until defendant had given the majority of his statements, including the court-reported statement, and that defendant never knew that his employer had provided him an attorney. Based on all of the evidence at the hearing, the trial court denied both defendant's motion to suppress statements and motion to quash arrest and suppress physical evidence.

TRIAL

Doctor Jaime Collings testified that he treated Debra at Lutheran General Hospital for second degree burns to her face and arms, a large evulsion of her right thigh and an open injury below her left knee where the bone was exposed. Debra suffered lesser shrapnel injuries to the side of her body and shoulder. Debra was in critical condition and remained in the intensive care unit of the hospital until October 1, 1993.

The parties stipulated to the testimony of the Cook County medical examiner, who determined that Wayne's death was caused by a

bomb blast. The medical examiner recovered metal projectiles from Wayne's body, including threaded pipe fragments and wire with clear plastic insulation. Similar fragments were recovered from the body of the Conrads' dog.

Niles police officer John Huinker testified that he questioned Ellen Marshall about the tool box at approximately 4 p.m. on the day of the explosion. Ellen told him that earlier that year, someone had put sugar in her gas tank. At about 5 p.m., Officer Huinker had a second conversation with Ellen, along with her mother, Sybil, and Officer Sall. Sybil stated that it was "probably Bill," or defendant, who delivered the stereo-radio box containing the bomb to the Marshall home. Ellen stated, "Mom, don't bring Bill into this, he wouldn't do something like that."

Agent Beebe testified that she interviewed Ellen at approximately 5:30 p.m. After a few minutes, Agent Beebe accompanied Ellen to her car to talk. While they were talking, an officer approached the car and told Agent Beebe that a package in Ellen's home had been identified as a bomb, and they needed to evacuate the area. Agent Beebe told Ellen that the stereo-radio package in her room contained a bomb. Ellen replied that if anyone would have done this to her, "it would have been Bill."

Later, when Agent Beebe interviewed defendant alone, he stated that he worked for an auto repair shop and a television repair shop. Defendant did not recall where he had gotten the stereo or when he had delivered the package. Defendant told Agent Beebe that he had the red tool box in his apartment "for a couple or years." Defendant then explained how he constructed the bomb in the tool box, then took the box up to Ellen's car that morning. He stated that he thought the tool box would just smoke and "flare up," and that he intended only to scare Ellen. Defendant told Agent Beebe that there were no additional bombs. At about 3:30 a.m., defendant repeated that he had built the bomb in the tool box.

Ellen Marshall testified that she met defendant at a party in August 1992, and they started dating. Ellen saw defendant a "few times a week," but he wanted her to spend more time with him. Around Christmas 1992, Ellen became pregnant by defendant. Ellen informed defendant of her intention to get an abortion, and defendant agreed. She terminated the pregnancy in January 1993.

Afterward, Ellen saw defendant less. In March 1993, they traveled together to Washington, D.C. During this trip, Ellen told defendant that the relationship was not working out and that she wanted to "remain friends." Defendant was unhappy and told Ellen that he loved her and still wanted to be with her. After their return, Ellen told defendant that she was interested in dating someone else.

In May 1993, Ellen's mechanic discovered sugar in the gas tank of her car and suggested that it was some form of "retaliation." Later that month, Ellen accompanied defendant to his sister's wedding, but she left shortly after the start of the reception and prior to the dinner.

Ellen saw defendant the last weekend of June 1993, when they attended a parade, then went to a movie. After the movie, Ellen again told defendant that "it wasn't working out." Defendant told Ellen that he felt he was not "good enough" for her and that he loved her, but he felt she had "betrayed" him.

On July 25, 1993, Ellen's grandmother died. Defendant sent Ellen a sympathy card, and Ellen called defendant to thank him. That same week, the package containing the stereo-radio arrived at her home.

After the explosion on August 31, 1993, Ellen ran outside and across the courtyard to a neighbor's house. From there, she saw Debra Conrad in her doorway, injured, and heard her say, "Ellen, it was the tool box."

Officer Karl Humbert of the Cook County sheriff's police explosives and hazardous devices section (bomb squad) investigated the scene of the explosion and found that the bomb had blown a hole through the Conrads' floor to the basement. During the investigation, the bomb squad officers learned of the stereo-radio package. X rays of the box containing the stereo revealed objects not ordinarily found in a radio, including a cylindrical object containing three-quarter-inch wire nails. The nails appeared to be suspended in space, indicating that they were held in place by an explosive material.

The bomb squad disarmed the bomb and found that the radio contained a length of PVC pipe filled with Hercules Red Dot smokeless powder and nails. They also observed the tan plastic cap from Edge shaving cream. The ignition device was an Estes brand model rocket ignitor. Officer Humbert characterized this device as a "booby trap," designed to explode when the radio was either plugged in or turned on.

After disarming the bomb, the bomb squad officers gathered evidence in the Conrads' home. They determined that the bomb that killed Wayne Conrad was a galvanized steel pipe bomb, powered by a six-volt wet cell battery. The bomb squad also recovered some unburned fragments of green dot smokeless powder and fragments of pipe, the red tool box, and electrical components. They determined that the tool box bomb had been ignited by an Estes brand model rocket ignitor.

Officer Humbert stated that the smokeless powder used in the

two bombs is easily obtainable at sporting goods stores and can be purchased with a firearm owner identification card. Officer Humbert stated that the two devices were very similar.

Sergeant McEnerney testified to the same substantial facts as in the pretrial hearing. In addition, Sergeant McEnerney testified that, at 3:30 a.m., defendant admitted that he had made the device that exploded in the Conrad townhouse. Defendant stated that he got the galvanized pipe out of the garage, the powder from a friend who had since died, and the tool box from his own home.

ASA Kinnerk testified that defendant described how he had constructed the bomb. Defendant told ASA Kinnerk that at dawn on August 31, 1993, he went to Ellen's parking lot and placed the tool box under Ellen's car. At the end of this conversation, defendant agreed to give his statement again with a court reporter present. The statement was transcribed verbatim by a court reporter. Defendant read all 22 pages of the statement but signed only the first two pages. As defendant prepared to sign the third page, he stopped and requested an attorney.

ATF forensic chemist Gregory Czarnopys testified that he examined the remnants and fragments of both the disarmed radio bomb, and the tool box bomb, as well as the items recovered from defendant's apartment and truck. Czarnopys confirmed the description of the bomb materials as described above. He stated that the nails had no other purpose but to "produce harm." All of the vents in the radio had been sealed with black three-quarter-inch duct tape, so that it was impossible to see into the radio. The radio bomb was designed to explode when plugged into a wall socket; the tool box bomb was activated by its lock mechanism.

Evidence seized from defendant's apartment was visually similar to the wire found in the tool box bomb. A microscopic examination of the wire revealed that it was identical to the wire used in the tool box bomb. Samples of tape were similarly consistent. The capless can of Edge shaving cream matched both in color and in fit to the caps found in the radio bomb.

The parties stipulated that a fingerprint recovered from the brown paper in which the radio bomb had been wrapped did not match that of defendant or any other individual associated with the case.

Detective Sall testified that during the search of defendant's apartment, he either stood in the living room or sat next to defendant on the couch. Defendant was not instructed to remain on the couch. Defendant made no telephone calls but would have been allowed to had he so desired. Officer Sall fed defendant's cats because

defendant was a possible suspect and the officer preferred that defendant not reach into the cabinet.

Following entry of the guilty verdict, the jury recommended a sentence of death. However, after a hearing, the trial court found factors mitigating a death sentence and sentenced defendant to consecutive terms of imprisonment of natural life for murder and 30 years for attempted murder, and concurrent terms of seven years for aggravated battery and five years for possession of an incendiary or explosive device. Defendant's timely appeal followed.

OPINION

## I. PRETRIAL MOTIONS

Initially, defendant contends that the trial court erred in denying defendant's motions to quash arrest and suppress evidence. Defendant argues that the evidence seized from his apartment failed to connect him to the bomb that exploded at the Conrad home killing Wayne Conrad but, rather, merely connected him to the stereo-radio bomb. Thus, defendant argues that his seizure was without probable cause and the items seized should have been suppressed. Defendant further argues that no probable cause existed to warrant his arrest.

■ On review, we will not disturb a trial court's determination on a motion to suppress absent a determination that the trial court's finding was manifestly erroneous. *People v. Melock*, 149 Ill. 2d 423, 599 N.E.2d 941 (1992). Further, it is the function of the trial court to determine the credibility of the witnesses and to resolve any conflict in their testimony. *People v. Redd*, 135 Ill. 2d 252, 289, 553 N.E.2d 316 (1990).

■ Both the United States and Illinois Constitutions protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. A seizure, for fourth amendment purposes, is synonymous with an arrest. Absent probable cause or a warrant based thereon, an arrest is violative of the fourth amendment protections. See *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979).

A person has been arrested when his freedom of movement has been restrained by means of physical force or a show of authority. *United States v. Mendenhall*, 446 U.S. 544, 553, 64 L. Ed. 2d 497, 508, 100 S. Ct. 1870, 1877 (1980). The relevant inquiry in determining whether a suspect has been arrested is whether, under the circumstances, a reasonable person would conclude that he was not free to leave. *People v. Eddmonds*, 101 Ill. 2d 44, 61, 461 N.E.2d 347 (1984); *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.

Additional factors considered in a determination of whether an arrest has occurred include the intent of the officer and the understanding of the suspect (*People v. Wipfler*, 68 Ill. 2d 158, 165, 368 N.E.2d 870 (1977)) and whether the suspect was told that he was free to leave or that he was under arrest. *People v. Holveck*, 141 Ill. 2d 84, 95, 565 N.E.2d 919 (1990).

■ Defendant argues that he was arrested when police officers requested that he remain seated on his couch while the officers searched his apartment. He further argues that he was arrested when police "required" him to ride to the police station with three police officers.

However, the record shows that defendant was not arrested at his apartment. The testimony at the hearing revealed that defendant was "just sitting on the couch" with Detective Sall. The record shows that defendant read and signed a form authorizing the authorities to search his apartment and that he gave the keys to his truck to officers to perform a search thereof. The record further shows that defendant agreed to accompany the officers to the Niles police station voluntarily and was offered the option of taking his own vehicle. Thus, defendant has not shown that he was in an "inherently coercive setting, which would affect substantially his will to resist or compel him to speak." See, *e.g., People v. Fischetti*, 47 Ill. 2d 92, 98, 264 N.E.2d 191 (1970), citing *People v. Cerrato*, 24 N.Y.2d 1, 246 N.E.2d 501, 298 N.Y.S.2d 688 (1969).

Although defendant testified that he did not see the consent form he signed, the trial court found that his testimony was not credible, and we cannot find that this determination was contrary to the manifest weight of the evidence.

■ Defendant further argues that the trial court's decision was improperly based on Sergeant McEnerney's "false or misleading testimony." Defendant cites as false the sergeant's testimony that he spoke to Ellen Marshall, and that Ellen implicated defendant, when in fact, Ellen testified that her mother Sybil talked to police and implicated defendant. In addition, defendant cites as false Sergeant McEnerney's testimony that he did not tell defendant that Ellen was dead, when Agent Beebe testified that Sergeant McEnerney told her that he had in fact told defendant that Ellen was dead.

The trial court specifically addressed the inconsistencies in some of the police officer's testimony, concluding that they were trivial:

> "I would also agree *** that there are some inconsistencies and contradictions among the police officers in this case, but I believe that is true in any extended motion or trial where you have various witnesses testifying as it is a human factor, and I don't place that much importance as to who fed the cats et cetera, et cetera."

In addition, defendant misrepresents Ellen's trial testimony. The record shows that while Ellen made the initial comment to her mother, she later admitted to Agent Beebe that if anyone would have done this to her, "it would have been Bill."

In light of the record, defendant has failed to show that the trial court's ruling was manifestly erroneous.

Next, defendant contends that the trial court erred in denying his motion to suppress statements. Defendant argues that his statement was not given voluntarily but was, in fact, the product of a "coercive atmosphere." Defendant argues that he was coerced into a confession by Sergeant McEnerney, who informed him that Ellen Marshall was dead and that his fingerprints had been located on the bomb.

■ For a confession to be admissible in evidence, the trial court must determine that it was made voluntarily without compulsion or inducement. *People v. Case*, 218 Ill. App. 3d 146, 577 N.E.2d 1291 (1991). The standard of voluntariness requires a knowing, intelligent and voluntary decision to confess. *People v. Kincaid*, 87 Ill. 2d 107, 429 N.E.2d 508 (1981); see also *People v. Bernasco*, 138 Ill. 2d 349, 562 N.E.2d 958 (1990). A confession is voluntary if, based on the totality of the circumstances, the accused's will was not overborne at the time he confessed; the confession must be the product of a rational intellect and a free will. *Kincaid*, 87 Ill. 2d at 117, 429 N.E.2d at 511; *People v. Jones*, 196 Ill. App. 3d 937, 957, 554 N.E.2d 516, 528 (1990). It is well settled that a reviewing court will not disturb a circuit court's finding on a motion to suppress unless it is manifestly erroneous. *People v. Gacho*, 122 Ill. 2d 221, 234, 522 N.E.2d 1146 (1988), *cert. denied*, 488 U.S. 910, 102 L. Ed. 2d 252, 109 S. Ct. 264 (1988); *People v. Neal*, 109 Ill. 2d 216, 218, 486 N.E.2d 898 (1985).

In support, defendant cites *Lynumn v. Illinois*, 372 U.S. 528, 9 L. Ed. 2d 922, 83 S. Ct. 917 (1963). There, upon the defendant's arrest for unlawful sale and possession of marijuana, police officers falsely told her that "if we took her into the station and charged her with the offense, that the ADC [Aid to Dependent Children] would probably be cut off and also that she would probably lose custody of her children." *Lynumn*, 372 U.S. at 533, 9 L. Ed. 2d at 926, 83 S. Ct. at 920. Under these circumstances, the Supreme Court found that the defendant's confession was coerced and reversed the defendant's conviction. *Lynumn*, 372 U.S. at 534, 9 L. Ed. 2d at 926, 83 S. Ct. at 920.

Defendant further relies on *People v. Lee*, 128 Ill. App. 3d 774, 471 N.E.2d 567 (1984). There, after the defendant's arrest for rape, the defendant denied that he had been in the complainant's apart-

ment on the night of the offense. The assistant State's Attorney (ASA) accurately told the defendant that he had been identified as the complainant's assailant, but intentionally misrepresented to the defendant that his fingerprints had been found in the complainant's apartment. The defendant then admitted that he had in fact been present in complainant's apartment on the night of the offense. At trial, the complainant testified that the defendant was her coworker and a social acquaintance who had visited her home on a prior occasion. This court reversed the defendant's conviction and remanded for a new trial, finding that the misrepresentation by the ASA regarding the fingerprints rendered defendant's subsequent confession involuntary and therefore inadmissible. *Lee*, 128 Ill. App. 3d at 781.

■ *Lynumn* and *Lee* are distinguishable from the present case. Here, both Sergeant McEnerney and Detective Sall testified that when they arrived at defendant's apartment the sergeant informed defendant that one person was dead and another injured. Although Agent Beebe testified that Sergeant McEnerney later told her that he had told defendant that Ellen Marshall was dead, Agent Beebe specifically informed defendant that Ellen Marshall was not dead, two hours prior to the time defendant gave his statement of confession. Under these circumstances, defendant has not shown that any misinformation about the life of Ellen Marshall contributed to his statement of confession.

Regarding defendant's further allegation that Sergeant McEnerney falsely represented that his fingerprints had been found "all over the bomb," there is no reliable evidence in the record that the officer made such a misrepresentation. The trial court determined that defendant's testimony at the hearing was not credible, and that determination is supported by the manifest weight of the evidence. Thus, defendant has not shown any error that rises to the level of those found in *Lynumn* and *Lee*.

■ Defendant further argues that he did not understand his constitutional rights when they were read to him.

The record reflects that when Sergeant McEnerney initially read defendant his *Miranda* rights, defendant said he had a question about his right to stop the questioning in order to consult with a lawyer. Sergeant McEnerney explained the right to defendant as follows:

> "If I start talking at any time that you find that you cannot answer a question or you would like an attorney, we'll stop asking you questions and you can consult with an attorney."

Defendant stated that he understood, then read and signed a separate acknowledgment and waiver of his rights.

Defendant further argues that he had no prior experience with

law enforcement and had a limited education; police threatened him and told him he would be injured while incarcerated; he was not allowed to sleep during the evening hours of August 31, 1993, and the early morning hours of September 1, 1993; and police never left him alone at the police station for more than a few minutes.

The trial court took into consideration that defendant had no prior experience with law enforcement but found as follows:

> "He is a mature adult. I listened careful [*sic*] to his testimony and of course the testimony of all of the witnesses, and I found the defendant to be very articulate, forceful, mentally sharp, and strong willed. And in addition to that, I found him to be very, very, precise when he was on the stand wanting to exact the diagram as far as his apartment, and other things of that nature during his testimony."

The trial court found that defendant's testimony was not credible and that defendant was not coerced into making his confession. We cannot conclude based on this record that the determination of the trial court was against the manifest weight of the evidence.

## II. PROOF OF THE CRIME BEYOND A REASONABLE DOUBT

Next, defendant contends that the State failed to prove the *corpus delicti* of the offenses of attempted first degree murder and possession of an explosive or incendiary device guilty beyond a reasonable doubt. Defendant argues that the State proved neither that he had the specific intent to kill Ellen Marshall and that he took a substantial step towards that act, nor that he had the intent to kill Wayne Conrad. Defendant further contends that the State improperly introduced evidence of other crimes at trial, in order to prove him guilty of the murder of Wayne Conrad.

■ Proof of *corpus delicti* requires both proof that a crime was committed and that it was committed by the person charged. *People v. Cloutier*, 156 Ill. 2d 483, 503, 622 N.E.2d 774 (1993); *People v. Lambert*, 104 Ill. 2d 375, 378, 472 N.E.2d 427 (1984). In cases where a defendant's confession is part of the proof of the *corpus delicti*, the prosecution must also adduce corroborating evidence independent of a defendant's own statement. *Lambert*, 104 Ill. 2d at 378-79. Such evidence need not rise to the level of proof beyond a reasonable doubt, but must only tend to confirm a defendant's confession. *Cloutier*, 156 Ill. 2d at 503. In this case, the *corpus delicti* of attempted first degree murder requires proof that, with intent to kill, the defendant committed an act that constituted a substantial step toward the commission of the murder. 720 ILCS 5/8—4 (West 1994); *People v. Burrage*, 269 Ill. App. 3d 67, 76, 645 N.E.2d 455 (1994).

■ Intent is a state of mind that can be shown by surrounding

circumstances, including the character of the assault and the use of a deadly weapon, and can be inferred when it has been shown that the defendant voluntarily and willingly committed an act, the natural tendency of which was to destroy another's life. *People v. Coolidge*, 26 Ill. 2d 533, 537, 187 N.E.2d 694 (1963); *People v. Winters*, 151 Ill. App. 3d 402, 405, 502 N.E.2d 841 (1986). Under the doctrine of transferred intent, a defendant's intent to kill the intended victim is transferred to the actual victim. *Burrage*, 269 Ill. App. 3d at 76.

Evidence of other offenses is admissible if relevant for any purpose other than to show propensity to commit a crime. *People v. Jones*, 156 Ill. 2d 225, 239, 620 N.E.2d 325, 330 (1993); *People v. Williams*, 285 Ill. App. 3d 394, 673 N.E.2d 1169 (1996). Other crimes evidence may be relevant to prove *modus operandi*, intent, identity, motive or absence of mistake. *People v. Robinson*, 167 Ill. 2d 53, 62-63, 656 N.E.2d 1090 (1995). Furthermore, whenever evidence of another crime is offered, there must be some similarity between the other crime and the crime charged in order to ensure that it is not being used to establish the defendant's criminal propensity. *People v. Johnson*, 239 Ill. App. 3d 1064, 1074, 608 N.E.2d 36 (1992). The trial court's decision to allow such evidence will not be reversed absent a clear abuse of discretion. *Robinson*, 167 Ill. 2d at 63.

In the present case, the record reveals evidence of *modus operandi*. Along with other circumstantial evidence, the evidence links defendant to the stereo bomb, and the stereo bomb itself provides overwhelming evidence that defendant built and delivered the tool box bomb with the clear intent to kill Ellen Marshall. The package was addressed to her, and it was filled with nails suspended in explosive powder which have no other purpose but to increase the amount of harm caused by the explosion. The record further shows that the tool box bomb was a "very similar" device, constructed of similar materials. Various components and fragments of each device matched materials discovered in defendant's apartment. The evidence therefore linked defendant to both bombs and provided a *modus operandi* for the crimes. Defendant's intent to kill Ellen transferred to Wayne Conrad when Wayne triggered the explosive device in the tool box. Therefore, the record shows that the State proved the *corpus delicti* beyond a reasonable doubt.

### III. JUROR IMPARTIALITY

Next, defendant contends that the trial court erred in failing to dismiss a juror who indicated during trial that he had failed to provide attorneys with accurate information during the *voir dire*.

During the course of the trial, the trial court received a note

from a juror stating that his daughter was a classmate of Wayne Conrad's daughter at the Nelson school at the time of the bombing and that the juror's daughter had told him about what had happened to the Conrad family.

The trial court conducted a hearing to inquire into the extent of the juror's knowledge. The juror stated that he had never met the Conrad family and did not know the Conrads' daughter. He further stated that he had not discussed this matter with any other juror and that he could be fair. The trial court denied defense counsel's motion to strike the juror in favor of an alternate.

The right to a jury trial guarantees to a criminal defendant a fair trial by a panel of impartial jurors. *People v. Cole*, 54 Ill. 2d 401, 411, 298 N.E.2d 705 (1973). A person is not competent to sit as a juror if his state of mind or mental attitude is such that, with him as a member of the jury, the defendant will not receive a fair and impartial trial. *Cole*, 54 Ill. 2d at 413. The burden of showing that a venireperson possesses a disqualifying state of mind is on the party making the challenge, and the determination of whether the venireperson has the state of mind that will enable him to give to an accused a fair and impartial trial rests in the sound discretion of the trial judge. This determination is not to be set aside unless it is against the manifest weight of the evidence. *Cole*, 54 Ill. 2d at 414-15.

In the present case, defendant failed to meet his burden of showing that the juror was prejudiced against him and could not be fair. The record does not reveal that the juror had any special friendship with the Conrads' daughter. Therefore, defendant has failed to show that the trial court erred in refusing to dismiss the juror for cause.

## IV. TRIAL JUDGE AS ADVOCATE

█ Next, defendant contends that the trial court improperly acted as an advocate on behalf of the State by highlighting certain evidence that was prejudicial to defendant. Defendant argues that, on several occasions, the trial court directed questions at witnesses that went beyond mere clarification of earlier testimony and that, instead, elicited damaging and highly prejudicial evidence against him.

Specifically, defendant objects to the following actions of the trial court: (1) asking an explosives expert whether the bomb in this case was equivalent to a hand grenade or was more powerful than a hand grenade; (2) asking Agent Beebe to describe the contents of the notes she made after her interview with defendant; and (3) instructing the jury as to the law at various points during the trial, rather than at the end of the trial.

The State initially responds that defendant has waived this issue for review for failing to object both at trial and in his posttrial motions. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988). In addition, the State notes that defendant fails to describe precisely how he was prejudiced by the trial court.

Nevertheless, a trial judge must take precautions not to assume the role of advocate when asking questions in a jury trial. The trial judge must question in a "fair and impartial manner, without showing prejudice or bias against either party." *People v. Gilbert*, 12 Ill. 2d 410, 415, 147 N.E.2d 44, 47 (1957). The line of judicial propriety "is clearly crossed when the judge departs from his function as a judge and assumes the role of prosecutor." *People v. McGrath*, 80 Ill. App. 2d 229, 236, 224 N.E.2d 660 (1967). When that happens, whether or not the defense objects, judicial influence fatally infects the trial. *People v. Santucci*, 24 Ill. 2d 93, 99, 180 N.E.2d 491 (1962); *People v. Rega*, 271 Ill. App. 3d 17, 648 N.E.2d 130 (1995).

In the present case, the record does not show that the trial judge improperly assumed the role of prosecutor. Regarding the explosive device, the trial judge asked for a comparison and did not demonstrate any unfair prejudice. The trial judge's request that Agent Beebe state the content of the additions to her notes was prompted by questions asked by the parties during trial wherein she stated that she made additional notes, but she did not state what the notes contained. Defendant does not argue that the content of these additional notes is incriminating.

## V. CLOSING ARGUMENTS

 Next, defendant contends that the State's closing arguments were prejudicial and thereby denied him a fair trial. Defendant argues that certain comments of the prosecutor inflamed the passions, prejudices and sympathy of the jury and misstated the applicable law.

The State responds that defendant has waived most of this issue on review, for failure to object to the specific comments at trial and to raise his objections in his posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124. The State notes that defendant failed to object to the remarks defendant now complains of in all but two instances.

In general, courts allow a great deal of latitude to the prosecution during closing and rebuttal arguments. *People v. Williams*, 147 Ill. 2d 173, 231, 588 N.E.2d 983 (1991); *People v. Smith*, 199 Ill. App. 3d 839, 854, 557 N.E.2d 596 (1990). When reviewing allegations of prosecutorial misconduct, the complained-of remarks must be

considered in the context of the entire closing arguments of both the State and the defendant. *People v. Cisewski*, 118 Ill. 2d 163, 175-76, 514 N.E.2d 970 (1987). In closing argument, a prosecutor may comment on the evidence and legitimate inferences arising therefrom, and such comments do not exceed the bounds of proper argument. *Williams*, 147 Ill. 2d at 231.

During closing argument, the prosecutor discussed Agent Beebe's testimony that she was "confused" when Sergeant McEnerney told her that he had informed defendant that Ellen Marshall had died. The prosecutor further commented that "McEnerney doesn't recall saying that." The prosecutor then stated: "And there will be no instruction that says that it's not a legitimate questioning technique." The trial court overruled defense counsel's objection to this comment. This comment by the prosecutor did not indicate that the conduct of the police constituted legitimate questioning techniques and "that it is done the same way in other cases," as defendant contends.

The trial court also overruled defendant's objection to the following comment:

"What the attorneys say is not evidence. And forgive me if I misstate the evidence at all. For example, in opening statement, we heard that Cindy Beebe told the defendant that you say you made the bomb and you just wanted to flash, and I'll save you. Did you hear anything like that at trial? No. None whatsoever. That doesn't exist."

Defendant fails to explain how this comment was improper.

The record does not show that defendant was denied a fair trial by either of the comments which were preserved by objection at trial.

## VI. SENTENCING

Next, defendant contends that the trial court erred in imposing a sentence of natural life without parole for the first degree murder of Wayne Conrad. Defendant argues that the trial court overlooked several statutory factors in arriving at the life sentence and also erred by finding that the murder of Wayne Conrad was brutal and heinous.

The sentencing decision of a trial court is entitled to great deference and weight (*People v. La Pointe*, 88 Ill. 2d 482, 431 N.E.2d 344 (1981)), and absent an abuse of discretion by the trial court, a sentence may not be altered upon review. *People v. Perruquet*, 68 Ill. 2d 149, 368 N.E.2d 882 (1977). This court will not substitute its judgment for that of the trial court merely because it would have balanced the appropriate factors differently had it been charged with the task of sentencing (*People v. Cox*, 82 Ill. 2d 268, 412 N.E.2d 541

(1980)), especially where the sentence imposed by the trial court is within the statutory limitation. *People v. Lambrechts*, 69 Ill. 2d 544, 372 N.E.2d 641 (1977).

The record indicates that the trial court found defendant eligible for the death penalty based on the statutory provision that:

> "the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom." 720 ILCS 5/9—1(b)(11) (West 1994).

Following a hearing in aggravation and mitigation, in which the trial court listened to witnesses and read the presentence investigation report, the trial court made the following finding:

> "The defendant has caused numerous families much sorrow and suffering including his own. The sending of a bomb concealed in an innocent toolbox is just outrageous. I believe that the manner in which he killed the victim was brutal and heinous in this particular case as well as premeditated. I do not want to see this defendant ever leave the penitentiary."

The trial court then sentenced defendant to a term of natural life for the murder of Wayne Conrad.

Our supreme court has held that the statutory phrase "exceptionally brutal or heinous behavior" must be given its ordinary meaning, and it has defined "heinous" as being "hatefully or shockingly evil; grossly bad; erroneously and flagrantly criminal." *People v. Lucas*, 132 Ill. 2d 399, 445-46, 548 N.E.2d 1003 (1989). Under the circumstances of this case, the trial court properly found the crime committed by defendant to be brutal and heinous and sentenced defendant accordingly. We find no error.

Finally, defendant contends that he was denied his right of allocution at sentencing, because the trial court asked him if he wished to make a statement after it had already imposed sentence.

The failure of the trial court to ask a defendant if he wished to make a statement is a technical error which does not require reversal. *People v. Munn*, 216 Ill. App. 3d 1058, 1062, 576 N.E.2d 582 (1991). The record shows that the trial court considered all the factors in aggravation and mitigation in determining defendant's sentence. Defense counsel acknowledged that the trial court followed proper sentencing procedure and concluded: "I don't have any request at this time to allow him to make that statement." Therefore, no error occurred in defendant's sentencing.

For all of the reasons stated above, we therefore affirm the judgment of the trial court.

Affirmed.

O'BRIEN and GALLAGHER, JJ., concur.